Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
1401 Dove Street
Suite 540
Newport Beach, CA 92660
Phone: 323-510-4060
Fax: 866-300-7367
Email: ktang@sfmslaw.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARGGIEH DICARLO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MONEYLION, INC., MONEYLION OF CALIFORNIA LLC, ML PLUS LLC, and ML WEALTH, LLC,<br><br>Defendants. | Case No. 5:19-CV-01374<br><br>**CLASS ACTION COMPLAINT FOR PUBLIC INJUNCTIVE RELIEF, DAMAGES, AND RESTITUTION**<br><br><br><br>**Dated: July 25, 2019.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Marggieh DiCarlo ("Plaintiff"), on behalf of herself and all others similarly situated, files this Class Action Complaint for Public Injunctive Relief, Damages, and Restitution (the "Complaint") against Defendants, MoneyLion, Inc., MoneyLion of California, LLC, ML Plus LLC, and ML Wealth, LLC ("MoneyLion"), and in support of the same, states and alleges as follows:

## INTRODUCTION

1.    Defendants represent their MoneyLion smartphone application (the "MoneyLion App" or "App") as a one stop financial-services shop for the 70% of Americans who live paycheck to paycheck and cannot afford traditional bank fees.[1] Through the App, MoneyLion offers a bank account, an investment account, loans, cash advances, loyalty rewards, automated feedback on spending habits, and tidbits of personal finance advice and trivia.

2.    MoneyLion promised that its App and affiliated consumer finance products would offer "Americans a revolutionary new way to get ahead" financially,[2] by leveraging "innovative technological approaches to improving customer outcomes."[3]

3.    This promise has gone unfulfilled—instead, MoneyLion has opted to engineer a high-tech debt trap, one that that allows it to raid consumers' bank accounts under the guise of collecting monthly "membership fees" and deny consumers' desperate pleas to escape.  MoneyLion has indeed leveraged technology—just not to

---

[1] Donna Fuscaldo, *MoneyLion Raises $160 Million At A Valuation Nearing $1 Billion*, Forbes.com (July 23, 2019), available at https://www.forbes.com/sites/donnafuscaldo/ 2019/07/23/moneylion-raises-160-million-at-a-valuation-nearing-1-billion/#1fdc5b78a527.

[2] *MoneyLion Announces America's Most Powerful and Rewarding Financial Membership*, BusinessWire (October 22, 2018), available at https://www.businesswire.com/news/home/2018 1022005516/en/MoneyLion-Announces-America%E2%80%99s-Powerful-Rewarding-Financial-Membership.

[3] *MoneyLion wins Celent Model Bank Award for Financial Wellness*, MoneyLion.com (April 25, 2018), available at https://www.moneylion.com/learn/moneylion-wins-celent-model-bank-award-for-financial-wellness/.

improve consumer outcomes.  MoneyLion has instead employed it to perpetrate its debt trap scheme on a massive scale.

4.    MoneyLion's scheme has supplied it with a healthy cash flow, earning the company much fanfare in the venture capital world.  To date, MoneyLion has secured more $227 million in venture capital funding—including closing a $160 million Series C round on July 22, 2019—as well as a $1 billion valuation.[4]

5.    The consumer side of the experience, by contrast, has presented no cause for celebration.

6.    A brief sampling of customer feedback on various websites and social media reveals the general flavor of consumers' experiences with MoneyLion:  "*they are stealing money*"; "*This company is a Bully and a predator to already credit vulnerable customers*"; "*They have false advertising*"; "*Thieves*"; "*Total nightmare*"; "*This is theft*"; "*This is UNETHICAL and DECEPTIVE*"; "*I have had enough of the abuse from this company*"; "*This is fraud*"; "*Its a trap dont do it*"; "*Shame Shame Shame*"; "*Run fast AWAY from this company!!*"; "*This is a scam!*"; and so on.

7.    The rest of this Complaint explains why.

## **PARTIES**

8.    Plaintiff is an individual resident of Upland, California and, thus, a citizen of California.  A licensed cosmetologist, Plaintiff took out a loan with MoneyLion on July 26, 2018, in hopes of building her credit so that she could open her own salon.

9.    Defendant, MoneyLion, Inc., is a Delaware corporation with its principal place of business located, upon information and belief, at 30 W. 21st St., Flr. 9, New York City, NY 10010.  MoneyLion, Inc., thus, is a citizen of Delaware and New York.

10.    MoneyLion, Inc. is the parent company and sole member of Defendants MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC, and, upon

---

[4] Donna Fuscaldo, *MoneyLion Raises $160 Million At A Valuation Nearing $1 Billion*, Forbes.com (July 23, 2019), available at https://www.forbes.com/sites/donnafuscaldo/2019/07/23/moneylion-raises-160-million-at-a-valuation-nearing-1-billion/#1fdc5b78a527.

information and belief, directs and manages the operations of Defendants, MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC.

11.    Defendant, MoneyLion of California, LLC ("MoneyLion of California"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010.  MoneyLion of California, thus, is a citizen of Delaware and New York.

12.    MoneyLion of California is a licensed finance lender by the California Department of Finance (License No. 603L583).  MoneyLion of California serves as the lending subsidiary through which MoneyLion makes loans to California residents, including Plaintiff.

13.    Defendant, ML Plus, LLC ("ML Plus"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010. ML Plus, thus, is a citizen of Delaware and New York.

14.    Upon information and belief, ML Plus is the MoneyLion subsidiary that operates the MoneyLion Plus membership program.

15.    Defendant, ML Wealth, LLC ("ML Wealth"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010.  ML Wealth, thus, is a citizen of Delaware and New York.

16.    ML Wealth is a registered investment advisor with the Securities and Exchange Commission.  ML Wealth manages the assets held in Plaintiff's MoneyLion Investment Account.

17.    All Defendants work in concert to operate the MoneyLion App and related services and to execute the scheme described herein.

## JURISDICTION AND VENUE

18.    This Court has personal jurisdiction over Defendants because they maintain offices in California, have engaged in business activities in, and directed to, the state of California and within this judicial district, and/or have knowingly committed unlawful acts within and directed at the State of California.

19.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) ("CAFA") because it seeks to proceed under Rule 23 of the Federal Rules of Civil Procedure, diversity of citizenship exists between at least one member of the putative class and at least one Defendant, and the amount placed in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

20.     Alternatively, this Court has original jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's Count IV arises under the laws of the United States, and supplemental jurisdiction over the state law claims exists under 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy.

21.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because Plaintiff resides here and, thus, a substantial part of the events or omissions giving rise to these claims occurred here and/or because a substantial part of the property that is the subject of this action is situated here.

22.     Venue is this district is also proper under 28 U.S.C. § 1391(b)(3) because each Defendant is subject to the Court's personal jurisdiction in this district with respect to this action.

## **GENERAL ALLEGATIONS**

### ***I.  Plaintiff's Experience with MoneyLion***

23.     In early 2018, Plaintiff began receiving internet advertisements for MoneyLion, including for its signature $500 5.99% APR Credit Builder Loan℠.

24.     Plaintiff, a licensed hair stylist by trade, planned to open her own salon in the next couple of years.  The product appealed to her.  In order to achieve her goals of opening her own salon, she would need to secure financing.  And in order to qualify for financing, she needed a positive credit history.

25.     Accordingly, in July of 2018, Plaintiff downloaded the MoneyLion App and attempted to obtain the $500 5.99% APR Credit Builder Loan℠.   The App

informed her that, to be eligible for the $500 5.99% APR Credit Builder Loan℠, she first must enroll as a member in the MoneyLion Plus program.

26.    In its advertising, on the App, and in the MoneyLion Plus Membership Program and Services Agreement Terms and Conditions (the "Plus Agreement," attached as Exhibit A) presented to Plaintiff before enrolling, MoneyLion represents that membership in its Plus program provides several benefits (in addition to eligibility for the $500 5.99% APR Credit Builder Loan℠), including:  a "Weekly Credit Score Refresh," "Automated deposits into Investment Account," "Daily Cash-Back to Investment Account," and "access to financial advice, social-media based customer service, and more."  *See* Exhibit A, p. 2.

27.    The Plus Agreement also states that MoneyLion Plus members "are required to pay a monthly twenty nine dollars ($29) Membership fee to Company . . . , which may be adjusted from time to time," ("Membership Fees") in addition to paying "fifty dollars ($50) each month ('Required Monthly Investment') into Your Investment Account."  *See* Exhibit A, pp. 4, 8.

28.    The Plus Agreement also provides that "[t]his Agreement may be terminated by either party, with or without cause, by notice to the other Party, subject to the specific terms and restrictions contained in this Membership Agreement and in the Advisory Agreement."   The only limitations the Plus Agreement places on Plaintiff's right to cancel are the following:

> i.  You may not terminate Your Membership unless Your Membership has been active for at least thirty (30) days;
>
> ii.  You will be charged a $0.25 withdrawal service charge by the Broker (the "Withdrawal Charge") when You terminate Your Investment Account. Any non-termination withdrawal will also be subject to the Withdrawal Charge. Adviser is not paid any portion of the Withdrawal Charge;

     iii.   Withdrawals for Plus Program members will not be processed if doing so would result in Your Investment Account retaining a value of less than $150 (the "Minimum Balance"). For Plus Program members, the remaining $150 may be withdrawn only upon account termination; and

     iv.   If You are a Plus Program member and if You have pledged the cash and securities in Your Investment Account to an Affiliated Lender or bank as collateral for a Loan pursuant to the terms of a Loan Agreement or to Company as collateral for a Cash Advance, You will not be permitted to terminate Your Investment Account and will be permitted to withdraw only such amounts that would result in Your Investment Account maintaining a balance which equals or exceeds Your outstanding loan balance. The Minimum Balance still applies.

*See* Exhibit A, p. 9.

29.     No terms of the Plus Agreement purport to restrict a member's ability to cancel their membership due to an outstanding Loan balance or unpaid Membership Fees.

30.     Because she needed the Loan—and because she had no reason to believe she could not cancel the MoneyLion Plus membership if she later decided that it was prohibitively expensive or otherwise not worthwhile—Plaintiff decided to give it a try. She enrolled in the MoneyLion Plus program on July 19, 2018.

31.     To complete her enrollment in the MoneyLion Plus program, Plaintiff was also required to sign—in addition to the ML Plus Agreement—four other contracts: an investment advisory agreement (the "Advisory Agreement," attached as Exhibit C) with ML Wealth, LLC, the subsidiary serves as advisory to the MoneyLion Investment Accounts; a "Broker Agreement" with related party DriveWealth, LLC; an "Automatic Payment Authorization" (attached as Exhibit E) granting ML Plus and its affiliates authority to initiate electronic fund transfers from the members bank accounts for Membership Fees, Loan payments, and "any additional fee services"; and an "Agreement for Resolving Disputes" (attached as Exhibit D) purporting to require

Plaintiff to submit any disputes against the MoneyLion-affiliated entities to mandatory arbitration, subject to certain exceptions (which, as described below, is unenforceable).

32.    On July 26, 2018, one week after enrolling in MoneyLion Plus, Plaintiff applied for and received the $500 5.99% APR Credit Builder Loan$^{SM}$.

33.    To finalize the transaction, MoneyLion presented Plaintiff with the MoneyLion Installment Loan Pledge and Security Agreement (the "Loan Agreement," attached as Exhibit B).   The Loan Agreement contained the following Truth in Lending Act Disclosures ("TILA Disclosures"), purportedly apprising Plaintiff the of the cost of borrowing:

TRUTH IN LENDING ACT DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount your credit will cost you. | Amount Financed The amount of credit provided to you. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.99% | $16.66 (e) | $500.00 | $516.66 (e) |

Exhibit B (Loan Agreement), p. 2.

34.    Under the Loan Agreement, Plaintiff agreed to make 12 monthly payments of $43.06:

| Your payment schedule will be: | | |
|---|---|---|
| Number of Payments | Amount of Payments (e) | When Payments Are Due |

| Number of Payments | Amount of Payments | When Payments are Due (the "Due Dates") |
|---|---|---|
| 1 | $43.06 | 2018-08-31 |
| 1 | $43.06 | 2018-09-28 |
| 1 | $43.06 | 2018-10-31 |
| 1 | $43.06 | 2018-11-30 |
| 1 | $43.06 | 2018-12-31 |
| 1 | $43.06 | 2019-01-31 |
| 1 | $43.06 | 2019-02-28 |
| 1 | $43.06 | 2019-03-29 |
| 1 | $43.06 | 2019-04-30 |
| 1 | $43.06 | 2019-05-31 |
| 1 | $43.06 | 2019-06-28 |
| 1 | $43.00 | 2019-07-31 |

*See* Exhibit B, pp. 2-3.

35.    Nothing in the Loan Agreement advised Plaintiff that she had committed to paying Membership Fees during the entire life of the Loan.

36.    And, while Plaintiff agreed to pledge her Investment Account as security for the Loan, nothing in the Loan Agreement or any other Agreement authorized MoneyLion to use her Investment Account at security for her Membership Fees.

37.    For each of the first four months of Plaintiff's Loan and Plus Membership, MoneyLion successfully withdrew by electronic fund transfer the $43.06 Loan payment, the $29.00 Membership Fees, and the $50.00 mandatory Investment Account contribution.

38.    In November of 2018, however, MoneyLion's attempted electronic funds transfers from Plaintiff's bank account, both for the Loan payments and the Membership Fees, failed due to insufficient funds in Plaintiff's primary account. Plaintiff, therefore, fell both behind on her Loan and, in MoneyLion's view, her Membership Fees.

39.    As a result of the failed payments, MoneyLion suspended Plaintiff's access to all MoneyLion Plus membership benefits, like the opportunity to earn "Daily Cashback" and receive weekly credit score updates.

40.    Despite the fact that MoneyLion did not provide her access to any membership benefits during the months corresponding to her missed payments, MoneyLion nonetheless treated Plaintiff's missed Membership Fees as due and owing.

41.    Thereafter, from December of 2018 through much of February 2019, Plaintiff attempted repeatedly to call MoneyLion's customer support line in order to make arrangements to pay her Loan (but cancel her MoneyLion Plus Membership and Investment Account contributions).

42.    Each time, Plaintiff encountered a labyrinthian menu of automated touch-tone options, with each selection leading to a new sub-menu. None of the options were responsive to Plaintiff's needs.  Not once during this time was Plaintiff able to speak to a human support representative regarding her concerns.

43.   Her calls were also frequently disconnected, a phenomenon widely reported by users in reviews and complaints about MoneyLion's services.

44.   Plaintiff tried to contact MoneyLion support again, this time via email on February 12, 2018, pleading to cancel her MoneyLion Plus membership.  Plaintiff requested, quite reasonably, that the approximately $210.00 that MoneyLion held in her Investment Account be applied to satisfy her outstanding Loan payments.



See Exhibit F, p. 2.

45.   Plaintiff was greeted three days later, on February 15, 2019, with an automated email response from MoneyLion's customer service.  The email was utterly nonresponsive to Plaintiff's concerns.

46.   Instead it simply contained a boilerplate recitation of MoneyLion's favorite phrase—"if you currently have an active Plus loan, you must first pay off the outstanding loan balance before you can cancel your membership"—and also advised Plaintiff that she must call MoneyLion customer support to cancel her Plus Membership.  See Exhibit F, p. 3.

47.   Plaintiff sent another email to MoneyLion's customer support on March 4, 2019.  Id., p. 4.  Two days later, Plaintiff received an automated response identical to the one she received on February 15th—nothing more.  Id., p. 5.

48.     Increasingly desperate, Plaintiff took her concerns to social media:




> Ttlghairparlour
> @ttlghairparlour
>
> I have had the most awful experience with @MoneyLion I have emailed and called and tried their live chat. With no help to make payments on their loan. I'm trying to pay them and they won't take payment unless I pay membership fees ?! I don't want the membership
>
> 9:54 AM - 7 Mar 2019

*Id.*, p. 6.

49.     But Plaintiff's Twitter post simply drew another automated response from MoneyLion:

> MoneyLion @MoneyLion · Mar 8
> Replying to @ttlghairparlour
> Hello! Were sorry to hear that you have had a bad experience with Moneylion. For the security of your account, we'd like to discuss this over a PM  so we may further assist you accordingly. We look forward to hearing from you.

*id.*, followed by MoneyLion blocking her account.



*Id.*, p. 7.

50.     Still desperate, Plaintiff tried a new strategy:  she pressed the touchtone command for new customers "seeking to obtain a MoneyLion Plus Loan."  This time, she was  immediately  routed  to  a  live  human  customer  support  representative.

MoneyLion apparently will only offer responsive, prompt, and human support to consumers seeking to enter—not manage or escape—its debt trap.

51.     On the call, a MoneyLion customer support representative advised Plaintiff that she was not eligible to cancel her MoneyLion Plus membership because she had an outstanding Loan balance.

52.     The MoneyLion customer support representative also refused Plaintiff's request to make payments on her Loan, stating that Plaintiff was required to pay all past due Membership Fees and Investment Account contributions before she could pay on her Loan—a sum which then stood at approximately $316.00.  Plaintiff was unable to do so.

53.     Nor would MoneyLion permit Plaintiff to use the funds in her Investment Account to pay the Loan.

54.      MoneyLion does not allow consumers any access to funds held in their Investment Accounts if they have an outstanding Loan or past due Membership Fees—even for the purpose of paying such outstanding Loan or past due Membership Fees.

55.     None of the conditions described above were ever disclosed to Plaintiff in her Agreements or otherwise.

56.     Unable to clear MoneyLion's insurmountable hurdles to cancelling her MoneyLion Plus membership, Plaintiff was ultimately forced to close her bank account to protect herself from MoneyLion's monthly onslaught of automated debits for Membership Fees and Investment Contributions, as well as the bank overdraft fees they caused.

57.     To date, according to MoneyLion, Plaintiff owes $711.00 in past-due Membership Fees, representing nine months' worth of fees (during which time Plaintiff received nothing in the way of membership benefits).

58.     And she must pay that amount, according to MoneyLion, before she is allowed to the privilege of making payments on her Loan; accessing the $223.62 in her Investment Account; canceling her MoneyLion Plus membership; stopping the

onslaught of monthly Memberhip Fees; and—ultimately—escaping the complete and utter financial nightmare that MoneyLion Plus membership has wrought on her life.

## II.  The Anatomy of a Debt Trap

59.     As it turns out, Plaintiff fell victim to a scheme MoneyLion has perpetrated against consumers—including California residents—on a massive scale. The rest of this section explains how MoneyLion's scheme works.

**<u>Step 1</u>:   Entice Customers to Enroll in MoneyLion Plus By Claiming That Membership Will Make Them Eligible for Cheap Loans—Loans That Are Falsely Represents to be 5.99% APR**

60.     MoneyLion offers a free version called "MoneyLion Core," and a paid "members only" version called "MoneyLion Plus."

61.     As described above, enrollment in MoneyLion Plus requires subscribers to pay a monthly membership fee of $29.00 ("Membership Fee"), in addition to depositing a minimum of $50.00 into the MoneyLion Investment Account (together, the "Plus Fees"), which is managed by a MoneyLion affiliate, ML Wealth LLC.

62.     If a user enrolls in MoneyLion Plus, the $29.00 Membership Fee and the $50.00 Investment Account contribution are automatically debited every month from a user's primary bank account (which users are required to give MoneyLion access to when singing up for an account).

63.     MoneyLion entices costumers to "upgrade" to the MoneyLion Plus ("Plus") membership program through the promise of its $500 5.99% APR Credit Builder Loans$^{SM}$ (the "Loan"), which it claims to offer with "No Credit Check" and "No Monthly Service Fees."

64.     Indeed, the only material differences between the free MoneyLion Core version and MoneyLion Plus is that a member gets the Loan, and MoneyLion gets its Membership Fees.

65.     Below is a comparison of the features taken straight from Plaintiff's MoneyLion Plus Membership Agreement:

| Feature | Available in Core? | Available in Plus? |
|---|---|---|
| Investment Account | Yes | Yes |
| Checking Account | Yes | Yes |
| Credit Monitoring Tools | Yes | Yes |
| Weekly Credit Score Refresh | Yes | Yes |
| **Monthly Credit Reporting to Bureaus** | **No** | Yes |
| **Members Only Facebook Group** | **No** | Yes |
| **Automated Deposits into Investment Account** | **No** | Yes |
| Financial Literacy Tips | Yes | Yes |
| **Low-APR Loans** | **No** | Yes |
| **Daily Cash-Back to Investment Account** | **No** | Yes |
| Rewards Points Redeemed at Retailers Nationwide | Yes | Yes |
| Referral Bonuses | Yes | Yes |

*See* Exhibit A, p. 2.

66. Of the five purported differences between the free and paid versions, two relate to Loans (eligibility for a Loan and reporting of the Loan to credit bureaus), two relate Membership Fees ("automated deposits into Investment Account" is just a way of stating MoneyLion's forced minimum $50 contribution as a benefit, and any "daily cash back" is simply a partial rebate of Membership Fees).

67. The only unrelated benefit—access to a special Facebook Group—costs MoneyLion nothing to provide; is wholly immaterial to users' enrollment decisions; and, upon information and belief, is used by less than 1% of MoneyLion Plus members.

68. So if a consumer joins MoneyLion Plus, it's invariably because he or she wanted access to the $500 5.99% APR Credit Builder Loan.

69. But the 5.99% APR figure is misleading—it does not account for the cost of Membership Fees.

70. MoneyLion's treatment of the Membership Fees is foreign to any reasonable consumer's understanding of the concept.

71. For example, if a borrower misses a Membership Fee payment—whether because of insufficient funds, a payment processing error, a desperate stop payment request to their primary bank, or another reason—MoneyLion will "pause" the

consumer's MoneyLion Plus membership.  When "paused" a customer is unable to access any of the features or benefits available through MoneyLion Plus.

72.     Yet MoneyLion still treats missed Membership Fee payment as a debt due and owing to the company—even though MoneyLion suspends the membership benefits of any consumer who is behind on their Membership Payments.  In other words, even though MoneyLion has provided zero MoneyLion Plus member benefits to a consumer during that month, it nevertheless demands payment its $29.00 Membership Fee.

73.     It would be reasonable for MoneyLion either to (a) suspend benefits for a particular month if a consumer failed to pay for them that month or, alternatively, (b) provide membership payments for that month but treat the unpaid Membership Fees as a due and owing debt to the company.  But in no reasonable world can MoneyLion provide no benefits for a given month yet simultaneously charge and collect Membership Fees for that same month (or months).

74.     Moreover, MoneyLion will not resume a member's access to Plus member benefits until all supposedly delinquent Membership Fees are paid in full.  For example, if a borrower misses a March membership payment, yet MoneyLion successfully debits $29.00 from her account for the following nine months, her membership will remain suspended during the entirety of that period, notwithstanding the fact that she has remitted $261 dollars.

75.     Only by paying the cumulative sum of all past due Membership Fees can a member regain her status as a "member in good standing," even though she will not—and indeed, cannot—receive "past due" membership benefits in return.

76.     MoneyLion's bizarre (and unconscionable) treatment of Membership Fees only makes sense when viewed in the context of their true purposes:  to function as disguised interest, and to perpetuate the Membership Fee trap.

77.     MoneyLion has admitted to consumers that they require payment of Membership Fees for the life of the Loan because MoneyLion does not perform credit

checks on borrowers.[5]  The Membership Fees therefore act to offset MoneyLion's risk of default by the borrower—a defining function of interest charges.

78.    As a result, taking the Loan proves to be a costly decision.

**Step 2:  Start Raiding Consumers' Accounts for Membership Fees**

79.    A consumer who has opted to take a $500 5.99% APR Credit Builder Loan℠ will soon notice that—between the $29.00 Membership Fee, the $50.00 mandatory Investment Account contribution, and the $43.06 Loan payment—more than $122.06 in MoneyLion-initiated electronic funds transfers is vanishing from his or her primary bank account each month.

80.    Unsurprisingly, given the financial profile of consumers who seek the 5.99% APR Credit Builder Loan℠ in the first instance, a $122.06 monthly expense presents a serious financial hardship (or at a minimum, a substantial inconvenience).

81.    Reasonably concluding that, while they rightfully owe and are willing to make their required payments on the Loan, an additional $79.00 in Plus Fees for access to a Facebook Group and slightly-more frequent credit score updates is too much, members then seek to cancel their MoneyLion Plus membership.

**Step 3:   Invoke Undisclosed Cancellation Criteria to Prohibit Consumers from Canceling their MoneyLion Plus Membership; Continue Raiding Consumers' Accounts for Membership Fees**

82.    Only then do they learn that MoneyLion will not allow consumers to cancel their MoneyLion Plus membership if they have an outstanding Loan balance, as reflected in the consumer complaints excerpted below (and many others just like them):

---

[5] *See*, *e.g.*, <u>CFPB Complaints</u>, Complaint No. 3034700, submitted October 2, 2018 ("I called [MoneyLion] and was explained that its a membership fee since they dont run credit.").

I was approved easily for a small {$500.00} loan as part of the MONEY LION PLUS PROGRAM and paying XXXX a month - I have no problem with that as I'm working to build my credit score while on a humble XXXX income I had to turn to 5 years ago as my condion worsend.. *Hower part of the money Lion plus program was they also deduct from my account ANOTHER {$79.00} -broken down into XXXX as a monthly membership fee and a XXXX into a "investment" account -* The loan I can handle ... My complaint is the other XXXX that is almost double my loan payment -- it's tightened up my budget beyond being doable in life needs - since the other XXXX is really my money voluntary put in a investment - *I called them, and asked to close my membership, send me The XXXX ( built up in "investment" ) that's mine, OR put it towards loan payment - seems fair and morally even I pay what's lended to me They said no way ... it will ALL continue till loan payed..*[6]

Hi   Good   Afternoon,   On XX/XX/XXXX in response to an advertisement I received from Moneylion, I signed up and was approved for a cost-effective short-term loan of {$600.00} at a 5.99 %. I reviewed in great detail every section of the contract ( attached ) before signing. I was told that {$23.00} would be deducted weekly ( every Friday ) for 26 weeks, with a total payment of {$600.00}. After the   first   withdrawal   on XX/XX/XXXX, I noticed a second withdrawal on the same day for {$31.00}. And this occured the following week as well - {$23.00} + {$31.00}. When I inquired with Moneylion, *I was then informed that a membership fee ( that was initially   advertised   as   {$79.00} initially ), is actually a recurring fee for the entire duration of your repayment,   bring   a   total membership fee to {$31.00} x 26 weeks = {$830.00}.* Nowhere in my contract was this ever stated or brought to my attention during the enrollment process. I am certain I would never sign up for this having been told so at the onset. I have since blocked the additional payment of {$31.00}   as   this   was   never communicated to me, but I shouldn't

---

[6] *Consumer Financial Protection Bureau Complaint ("CFBP")*, Complaint No. 3172846, submitted March 7, 2019 (emphasis added).

have to do so.[7]

83.     This practice was never disclosed during the process of enrolling for MoneyLion Plus or applying for the Loan, including in any of the five separate Agreements MoneyLion requires members to sign during the process.

84.     Worse yet, MoneyLion also refuses to allow consumers to cancel their MoneyLion Plus membership if they have past-due Membership Fees.

85.     MoneyLion uses the existence of past due Membership Fees as grounds for denying consumers' requests to cancel their MoneyLion Plus membership, thereby justifying (at least in Defendants' view) MoneyLion's continued extraction of Plus Membership Fees from consumers' bank accounts, month after month, potentially into perpetuity.

86.     This practice, too, was never disclosed during the process of enrolling for MoneyLion Plus or applying for the Loan, including in any of the five separate Agreements MoneyLion requires members to sign during the process.

**Step 5:** **Impose Insurmountable Barriers to Satisfying MoneyLion's Undisclosed Cancellation Criteria; Continue Raiding Consumers' Accounts for Membership Fees**

87.     As explained above, customers without the financial means to make a lump-sum payment sufficient to eliminate their outstanding Loan balance have no prayer of successfully cancelling their MoneyLion Plus membership and escaping the Membership Fee trap.  MoneyLion will summarily refuse their request to cancel the Plus Membership because if they have an "active loan."

88.     For customers who can pay in lump sum their entire outstanding Loan balance, MoneyLion erects numerous additional barriers cancelling their membership and escaping the Plus Membership Fee trap.  These barriers, either individually or in combination, often prove insurmountable.

---

[7] *CFPB Complaint*, Complaint No. 2866241, submitted April 5, 2018 (emphasis added).

89.   **Requiring Full Payment of All Past-Due Membership Fees *And Investment Account Contributions*.**   MoneyLion requires that, in addition to paying off the Loan and all past-due Membership Fees, *a member must also pay any missed $50.00 monthly Investment Account Contributions before MoneyLion will permit her to terminate her MoneyLion Plus membership*.   This amount alone can easily exceed the principal value of the Loan.

90.   In Plaintiff's case, as of the date of this filing, MoneyLion demands that she pay $711.00 in Membership Fees and Investment Account contributions (*i.e.*, ($29.00 + $50) x 9 months) just for the privilege of cancelling her membership.



*See* Exhibit G, p. 2.

91.   MoneyLion will liquidate a member's Investment Account after he cancels his MoneyLion Plus membership.   Thus, there is no sensible purpose for requiring a member to make Investment Account contributions before he may cancel his membership, only to return those very same contributions upon cancellation.   The only rational purpose such a practice could serve is to increase the barriers to cancelling the MoneyLion Plus membership.

92.   MoneyLion will continue attempting to debit Membership Fees and Investment Account contributions each month.   If the fund transfer is successful, MoneyLion is enriched $29.00, while the consumer receives nothing—no access to any "Plus perks" or any reduction in the outstanding Loan balance.   If the fund transfer

is unsuccessful, MoneyLion adds the unpaid fees the customer's past-due Membership Fee balance, further increasing the cost of cancelling.

93.     MoneyLion repeats this process each ensuing month.

94.     With each passing month, the consumer's prospects of bringing her membership "current," and thereby escaping the Membership Fee trap, grow dimmer.

95.     **Refusing to Allow Customers to Use Their Investment Account Funds To Pay Their Loan Balance.**   As described above, $50 of the $79 in monthly Membership Fees are placed in consumers' MoneyLion-managed Investment Account.

96.     One potential silver lining for consumers victimized by MoneyLion's scheme is that they often accumulate a decent chunk of savings in their Investment Account contribution—typically several hundred dollars or more.

97.     But even the Investment Account has its own role in MoneyLion's scheme.

98.     First, it diminishes the quantity of available funds that borrower could otherwise use to pay off their Loan or Membership Fees (and thereby meet MoneyLion's undisclosed cancellation criteria).

99.     Indeed, consumers seeking to cancel their MoneyLion Plus membership have quite reasonably requested that MoneyLion liquidate their Investment Accounts and use the proceeds to pay off their Loan balance.

100.   No luck, says MoneyLion.  A user cannot access her Investment Account while she (a) has a loan, or (b) is behind on Membership Fees.  And, MoneyLion permits a borrower to use her Investment Account to pay off the Loan "*if and only if* the [L]oan has been delinquent for 90 days or more."[8]

---

[8] *MoneyLion Response dated 6/28/19  to Anonymous BBB Complaint dated May 21, 2019*, available at https://www.bbb.org/us/ny/new-york/profile/consumer-finance-companies/moneylion-inc-0121-165324/complaints (accessed July 18, 2019) (emphasis added).

101.   By that time, MoneyLion will have reported the Loan as seriously delinquent to all three credit bureaus, thereby decimiting the consumers credit score—a disappointing result indeed for a borrower who took out a "*Credit Builder* Loan."

102.   MoneyLion will also have helped itself to at least three more rounds of Membership Fees during this time period.

103.   MoneyLion's second purpose for the Investment Account is to provide an easy source from which to collect Membership Fees.

104.   Upon liquidating a user's Investment Account, MoneyLion will deduct from the proceeds all past-due Membership Fees before returning whatever is left to the borrower.

105.   Thus, MoneyLion uses the mandatory Investment Account contributions—not as a means to improve members' financial wellbeing by encouraging savings behavior—but instead, as a means to secure its collection of past-due Membership Fees.[9]

106.   **Technical Obstacles and Wholly Unresponsive Customer Support.** Unsurprisingly, MoneyLion's purported enthusiasm for empowering consumers over their finances through technology does not extend to empowering them to cancel their MoneyLion Plus membership.

107.   Unlike enrolling in MoneyLion Plus, there is no mechanism by which a customer can to cancel her MoneyLion Plus membership through the MoneyLion App.

108.   Instead, MoneyLion attempts to funnel all cancellation requests (and all requests that would serve as a prerequisite to cancelation, such as paying off the Loan or past due Plus Fees) to its customer service telephone line.

---

[9] *See, e.g.*, *MoneyLion Response dated 6/6/19 to Anonymous BBB Complaint dated May 15, 2019*, available at https://www.bbb.org/us/ny/new-york/profile/consumer-finance-companies/moneylion-inc- 0121- 165324/complaints (accessed July 19, 2019) ("With respect to his current Investment Account balance of $290.41,subject to securities market fluctuations, MoneyLion will offset the membership fees owed of $121.08 and provide a liquidation of proceeds to *** ******* of approximately $169.33.")

109.   If a borrower attempts to submits a cancellation request via email, MoneyLion either will decline to respond at all, or will send an automated email response instructing the borrower to call MoneyLion's telephone helpline.

110.   If the borrower does telephone MoneyLion's customer support line to cancel his MoneyLion Plus membership, his efforts will almost inevitably fail.

111.   Below is a sampling of social media posts, *during a mere 15-day period*, describing consumers experiences when attempting to contact MoneyLion's customer support:

> "*Ive been waiting for a call back for going on 2 hours . . .*"; "*I was waiting 3 hours on the phone to speak to someone still no [one] picks up . . .*"; "*And, day 18, still no response to my emails . . .*"; "*WORST BANKING EXPERIENCE . . . the phone numbers hang up on me or won't connect to an agent after waiting an hour. You wont reply to support, or complaint issues. You wont respond to help tickets. I'm out of options . . .*"; "*got a rep after waiting 30 mins the first call but the call ended. No[]call back even though they verified call back number. Now this is my second attempt so I can pay much loan payment and no rep . . .*"; "*Hey Moneyl[ion] why aren't you answering the phone . . .*"; "*I have been trying to call all day. Waited 45min on my break and no answer on hold. Now after work been on hold for about 37 min . . .*"; "*EVERY TIME I CALL CUSTOMER SERVICE I CAN NEVER TALK TO AN ACTUAL PERSON*"; "*What is going on Moneylion, been contacting you guys for two days now, I need to pay off my loans and withdraw my investment . . .*"; "*I can't not believe how many timrs I been placed on hold with mineylion . . .*"; "*I have tried for the past 4 days to speak with a Customer Service Representative . . .*"; "*Been waiting for someone to answer for a freaking hour now . . .*"; "*Nobody seems to want to help me after I sit on hold for 2 hours!!*"; "*Cannot get ahold of anyone at this company*"; "*Oh and [MoneyLion's] support never answers any questions, and their phone line puts you on hold (my record is 1.5 hours) with no one ever answering . . .*"; "*Your customer support sucks. It is an endless rabbit hole. One the*

*phone and online*"; "*Customer service is impossible to reach. F[\*\*\*] your automated responses because almost everyone who has issues has filed their damn tickets and NOTHING HAPPENS*"; "*I'm closing my account after being on hold for 2.5 hours! This is ridiculous*"; "*No transparency, nobody to answer phone calls. Just keeping taking money and be quiet... wtf?!*"; "*After being on hold for almost a hour this morning we got zero things accomplished . . .*"; "*Care to explain this atrocious hold time?*"; "*ANSWER THE PHONE!!! 55 Minutes on hold is unacceptable!!*"; "*I swear @MoneyLion only has 2 employees. It shouldn't be this hard to speak with someone*"; "*Your hold times are ridiculous . . . Been on hold for 1 hr and nobody can even pick up a phone*"; "*And now trying to call @MoneyLion I can't even get past the menu as I get hung up on. Super disappointing*"; "*@moneylion customer support has hung on me SIX times today and I've yet to speak to anyone . . .*"; and so on.

*See generally* Exhibit G.

112. In the meantime, MoneyLion's monthly onslaught of Membership Fees continues—each month, every month, with no end in sight.

## CLASS ACTION ALLEGATIONS

113. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed class defined as follows:

> **All California residents who paid or were charged MoneyLion Plus membership fees at any time during the Class Period. The "Class Period" shall extend from November 1, 2017 to the day on which this Court certifies this case as a class action. Excluded from the Class are Defendants, any entity in which any Defendants has a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and Class Counsel, Class Counsel's immediate family, and all persons employed by Class Counsel.**

114. Plaintiff reserves the right to amend this class definition and, if deemed appropriate, to divide the Class into subclasses.

115.   Plaintiff seeks to recover, on behalf of herself and the Class Members, all principal, interests, and fees—including Membership Fees—paid by, charged to, or assessed to the Class Members in connection with a Loan extended by Defendants to Plaintiff and the Class Members.

116.   Plaintiff also seeks to recover any penalty or enhancement to which she and the Class Members are entitled, along with attorneys' fees and costs.

117.   Plaintiff further seeks a permanent injunction to ensure that the wrongful conduct described herein cease, with no threat of recurrence in the future.

### I. The Class Satisfies Rule 23's Requirements

118.   This action may properly be maintained as a class action under Federal Rule of Civil Procedure 23, because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

(a) **Numerosity:** There are approximately 52,000 California residents who are MoneyLion Plus members.  The Class as defined is therefore so numerous that joinder of all the Class Members is impracticable.

(b) **Commonality:** There are questions of law and fact common to Plaintiff and the Class that predominate over any questions affecting only individual Class Members. These common questions of law and fact include, but are not limited to:

    i.   Whether MoneyLion's general employment of a scheme calculated at every turn to maximize the period by which MoneyLion can justify syphoning Membership Fees from borrower's bank accounts is unfair;

    ii.   Whether MoneyLion has contracted or received "charges," as the term is defined by Cal. Fin. Code § 22201, from Plaintiff and the Class Members at rates exceeding the amounts authorized under Cal. Fin. Code § 22201;

    iii.   Whether MoneyLion has required in connection with, or incidental to, the making of consumer loans, that Plaintiff in the Class Members

contract for or agree to purchase a MoneyLion Plus membership, in violation of the collateral sale prohibition set forth in Cal. Fin. Code § 22311 and § 22312;

    iv.  Whether MoneyLion has employed a devise, subterfuge, or pretense to charge, contract, and receive greater interest, consideration, or charges than the amounts or types authorized by the California Finance Code, principally by disguising interest charges as "membership fees" and making them payable to Defendant ML Plus, a non-licensed lender;

    v.  Whether MoneyLion has denied Plaintiff and the Class Members their right to redeem their collateral by refusing to accept their tender of their Investment Accounts to satisfy their loan debt, in violation of Cal. Com. Code § 9623.

    vi.  Whether MoneyLion's practice of prohibiting Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until their entire loan balance is paid is unfair;

    vii.  Whether MoneyLion's practice of prohibiting Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until all past-due Membership Fees are paid is unfair;

    viii.  Whether MoneyLion's failure to disclose its practice of preventing Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid is unfair;

    ix.  Whether MoneyLion's practice of assessing Membership Fees for months during which Plaintiff and the Class Members received no membership benefits (because their membership benefits were "paused" by MoneyLion) is unfair;

    x.  Whether MoneyLion's refusal to resume membership benefits in months that Plaintiff and the Class Members did, in fact, pay

Membership Fees based on the existence of prior missed membership payments is unfair;

xi.  Whether MoneyLion's practice of requiring Plaintiff and the Class Members to endure inordinate wait times for customer service calls, and otherwise using unresponsive, incomprehensible, and technically deficient customer service systems to make process of cancelling one's MoneyLion Plus membership impossible or unduly burdensome is unfair;

xii.  Whether MoneyLion's has falsely or misleadingly advertised its products as containing "no hidden fees";

xiii.  Whether MoneyLion has falsely or misleadingly advertised its Loans to carry an APR of just 5.99%;

xiv.  Whether MoneyLion charged and/or collected interest or fees at a usurious rate from Plaintiff and the Class Members;

xv.  Whether MoneyLion has violated the disclosure requirements of the Truth in Lending Act and Regulation Z;

xvi.  Whether Plaintiff and the Class Members are entitled to injunctive relief restraining MoneyLion from engaging in the wrongful conduct alleged in this Complaint; and/or

xvii.  Whether Plaintiff and the Class Members are entitled to recover damages, restitution, enhancements, and penalties and, if so, the nature, extent, and amount of such damages, restitution, enhancements, and penalties.

(c) **Typicality:** Plaintiff's claims are typical of the claims of the Class. MoneyLion's common scheme, practices, and course of conduct have caused Plaintiff and Class Members to sustain the same or similar injuries and damages. Plaintiff's claims are thereby representative of, and co-extensive with, the claims of the Class Members.

(d) **Adequacy of Representation:** Plaintiff is a member of the Class; she does not have any conflicts of interest with other Class Members; and she will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiff is competent and experienced in litigating large class actions, including those involving Cal. Bus. & Prof. Code §17200 and Cal. Civ. Code § 1750. Plaintiff will fairly and adequately represent and protect the interests of the Class Members.

(e) **Superiority of a Class Action:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all proposed Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each proposed Class member has been damaged and is entitled to recovery by reason of MoneyLion's unlawful, unfair, or otherwise improper practices. Class action treatment will allow those similarly situated person to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.   The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible.   Individualized litigation increases the delay and expense to all Parties and the Court.   By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the Parties and the judicial system.

119.   In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, and, in turn, would establish incompatible standards of conduct for MoneyLion.

## II.   *MoneyLion's Arbitration Agreement Does Not Prohibit This Case from Proceeding in Court or as a Class Action*

120.   As a condition to enrolling in ML Plus and again upon obtaining the Loan, MoneyLion requires users to sign "Agreements For Resolving Disputes," attached to this Complaint as Exhibit D.

121.   MoneyLion's Agreement for Resolving Disputes contains an arbitration clause, purporting to require members submit all "Claims" (a term defined within the Agreement) against MoneyLion or its affiliates to binding arbitration.

122.   Paragraph 5 of the Agreement for Resolving Disputes purports to require Plaintiff to wave, certain rights, including her right to:

> (C) ***PARTICIPATE IN A CLASS ACTION*** IN COURT OR IN ARBITRATION, EITHER AS A CLASS REPRESENTATIVE, CLASS MEMBER OR CLASS OPPONENT; (D) ***ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION***; OR (E) JOIN OR CONSOLIDATE CLAIM(S) INVOLVING YOU WITH CLAIMS INVOLVING ANY OTHER PERSON . . . .

*See* Exhibit D, p. 4, § 5 (emphasis added).

123.   However, Paragraph 10 of the Agreement for Resolving Disputes contains a "poison pill" clause, which provides that "[i]f Section 5(C), (D) and/or (E) [*i.e.,* the provisions quoted in the preceding Paragraphs] is declared invalid in a proceeding between you and us, without in any way impairing the right to appeal such decision, this entire Arbitration Provision (other than this sentence) shall be null and void in such proceeding." *See* Exhibit D, p. 5, § 10.

124.   Here, one of the conditions triggering the language of the poison pill clause is present.  Specifically, Section 5(D)—which prohibits Plaintiff from "act[ing] as a private attorney general in Court or in Arbitration"—contravenes the strong public policy of California because it purports to waive Plaintiff's right to seek public injunctive relief under the CLRA, UCL, and/or California's False Advertising Law.  It is therefore invalid under *McGill v. Citibank*, N.A., 2 Cal. 5th 945 (2017).

125.   The unenforceability of Section 5(D)'s waiver of Plaintiff's right to seek public injunctive relief activates the poison pill clause in Section 10, which in turn nullifies and voids the entire Agreement for Resolving Disputes—including the mandatory arbitration clause and class-action waiver.

126.   Accordingly, Plaintiff may seek the relief requested by this Complaint in Court and on a class-wide basis.

## COUNT I
### Violations of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

127.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

128.   Plaintiff and Defendants are each "person(s)" within the meaning of California's Unfair Competition Law (Cal. Bus. & Prof. C. §§ 17200 *et seq.*).

129.   Cal. Bus & Prof. C. § 17204 authorizes a private right of action on both an individual and a representative basis.

130.   Cal. Bus. & Prof. C. § 17204, a provision of the Unfair Competition Law, confers standing to prosecute actions for relief not only on certain public enforcement officials, but on private individuals—*i.e.*, "any person acting for the interests of itself, its members or the general public."

131.   Thus, a private plaintiff who has suffered a financial injury may sue in a private attorney general capacity to obtain relief for others.

132.   California Bus. & Prof. Code § 17200 defines "unfair competition" to include any business act or practice that is "unlawful," "unfair," or "fraudulent," or that constitutes "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are stated in the disjunctive; thus, each of category wrongs independently suffices to support a claim for unfair competition.

133.   Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth,

LLC, has engaged in *unlawful* business practices that include, but are not limited to, the following:

 (a) Lending money in connection with a consumer loan, and contracting or receiving "charges," as the term is defined by Cal. Fin. Code § 22201, at rates exceeding the amounts authorized under Cal. Fin. Code § 22201;

 (b) Requiring, in connection with or incidental to the making of consumer loans, that borrowers contract for purchase, or agree to purchase, a MoneyLion Plus membership, in violation of the collateral sale prohibition set forth in Cal. Fin. Code § 22311 and § 22312;

 (c) The employment of a devise, subterfuge, or pretense to charge, contract, and/or receive greater interest, consideration, or charges than the amounts or types authorized by the California Finance Code, principally by disguising interest charges as "membership fees" and making them payable to Defendant ML Plus, a non-licensed lender;

 (d) Denying borrowers their right to redeem their collateral by refusing to accept borrowers' tender of their Investment Accounts to satisfy their loan debt, in violation of Cal. Com. Code § 9623.

134. Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC have engaged in *unfair* business practices that include, but are not limited to, the following:

 (a) Maintaining a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships until their entire Loan balance is paid;

 (b) Maintaining a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships until all past and present MoneyLion Plus Membership Fees are paid;

 (c) Failing to disclose that MoneyLion maintains a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships

until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid;

(d) Demanding that borrowers to pay Membership Fees for months during which they received no membership benefits because their membership benefits were "paused" by MoneyLion;

(e) Refusing to resume Membership Fees in months that borrowers did pay membership fees based on the existence of missed membership payments for past months (months during which the borrowers received no membership benefits anyway because MoneyLion paused them);

(f) Requiring borrowers seeking to cancel their MoneyLion Plus membership to endure inordinate wait times for customer service calls, and otherwise using unresponsive, incomprehensible, and technically deficient customer support systems to create barriers to borrowers cancelling their MoneyLion Plus memberships;

(g) Collecting past-due Membership Fees supposedly owed to MoneyLion by offsetting such sums against funds borrowers have saved in their Investment Accounts;

(h) Generally operating a scheme calculated at every turn to maximize the period by which MoneyLion can justify syphoning Membership Fees from borrowers' bank accounts; and/or

(i) Engaging in other conduct substantially injurious to consumers, offensive to public policy, immoral, unethical, oppressive, unscrupulous, and for which the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

135. Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC have engaged in *unfair, deceptive, untrue or misleading advertising*, which includes, but is not limited to, the following:

(a) Falsely advertising that the Loan contains "no hidden fees";

(b) Falsely advertising that the Loan carries an APR of just 5.99% and costs borrowers no more than $16.66 in expected interest charges; and/or

(c) Falsely advertising that the cost of borrowing via the Loan is lower than the cost of borrowing using a typical credit card or comparable financial product.

136.   Defendants MoneyLion of California, MoneyLion, Inc., ML Plus, and ML Wealth, could and should have furthered their legitimate business interests by not perpetrating an unlawful scheme on the entire representative class of California borrowers.

137.   Plaintiff has suffered injury in fact and has lost money and/or property as a result of the unfair competition described herein.

138.   Accordingly, Plaintiff is entitled to restitution, as well as a public injunction on behalf of the people of California to enjoin ongoing and future violations of California's Unfair Competition Law.

## COUNT II
### Injunctive Relief for Violations of California's Consumer Legal Remedies Act
### (Cal. Civ. Code §§ 1750 *et seq.*)

139.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

140.   California's Consumers Legal Remedies Act ("CLRA") sets forth a list of prohibited "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."

141.   The Legislature's intent in promulgating the CLRA is reflected in Section 1760, which mandates that its terms are to be "[c]onstrued liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

142.   MoneyLion's Loans and MoneyLion Plus membership program constitute "services" under Cal. Civ. Code § 1761(a).

143.   Plaintiff and the Class Members are each a "consumer" under Cal. Civ. Code § 1761(d).

144.   Plaintiff's and the Class Members' Loans and Membership Fees constitute "transactions" under Cal. Civ. Code § 1761(e).

145.   MoneyLion's scheme violates Subsections (a)(5), (a)(9), (a)(14), (a)(16), (a)(19), (a)(26) of Cal. Civ. Code § 1770, including by:

(a) representing that the Loan and/or membership have characteristics that they does not have;

(b) advertising the Loan as 5.99% APR with the intent to charge borrowers more than 5.99% APR;

(c) representing that MoneyLion is entitled to require membership as a condition to taking out or maintaining a Loan, when such conduct is prohibited by law;

(d) representing that the Loan and/or membership have been supplied in accordance with previous representation when they have not;

(e) inserting unconscionable clauses in contracts;

(f) and advertising, offering for sale, or selling a financial product that is illegal under California and federal law.

146.   Plaintiff and the Class members have suffered harm by the conduct described in this Complaint and will continue to suffer harm unless such conduct is enjoined by this Court.

147.   Should MoneyLion not comply with Plaintiff's demand letter Pursuant to California Civil Code § 1782, Plaintiff intends to amend this Complaint to include a claim for damages under the Consumers Legal Remedies Act on behalf of herself and the Class Members.

## COUNT III
### Violations of California's Anti-Usury Laws
### (Cal. Const. art. XV, § 1 and Cal. Civ. Code § 1916-2)

148.    Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

149.    Defendants MoneyLion, Inc. and MoneyLion Plus—unlike Defendant MoneyLion of California—are not licensed by the California Division of Finance.

150.    Defendants MoneyLion, Inc. and MoneyLion Plus therefore do not qualify for any exemption from California's constitutional usury provision or from Cal. Civ. Code § 1916-2.

151.    Cal. Const. art. XV, § 1 prohibits Defendants MoneyLion, Inc. and MoneyLion Plus from "charging any fee, bonus, commission, discount or other compensation receive[d] from a borrower more than the interest authorized by this section upon any loan," or 10 percent per annum.

152.    Alternatively, Cal. Civ. Code § 1916-2 prohibits Defendants MoneyLion, Inc. and MoneyLion Plus "directly or indirectly tak[ing] or receiv[ing] . . . any greater sum or any greater value for the loan . . . than at the rate of twelve dollars upon one hundred dollars for one year," or 12%.

153.    Nevertheless, Defendants MoneyLion, Inc. and MoneyLion Plus have charged and continue to charge fees and interest (the disclosed interests plus the supposed Membership Fees) to borrowers at a rate exceeding 72%.

154.    The fees and interest that Defendants MoneyLion, Inc. and MoneyLion Plus charge to borrowers are plainly usurious under Cal. Const. art. XV, § 1 and Cal. Civ. Code § 1916-2.

155.    Plaintiff and the Class Members have suffered harm as a result of Defendants MoneyLion, Inc. and MoneyLion Plus charging and/or receiving interest and fees at usurious rates, including financial loss and reputational harm.

156.    Pursuant to Cal. Civ. Code § 1916-3(a), Plaintiff and the Class Members are entitled to recover three-times losses they have sustained as a result of Defendants

MoneyLion, Inc. and MoneyLion Plus charging and/or receiving interest and fees at usurious rates.

## COUNT IV
### Violations of Truth in Lending Act and Regulation Z
### (15 U.S.C. §§ 1601 *et seq.*)

157.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

158.   The Loans marketed, originated, and serviced by MoneyLion are closed-end consumer installment loans.

159.   The Truth in Lending Disclosure statement prepared by Defendant MoneyLion of California disclosed an amount financed of $500, a finance charge of $16.66, an annual percentage rate of 5.99%, and a security interest in Plaintiff and the Class Members' Investment Accounts and Automatic Payment Authorizations.

160.   "Finance charge," as defined in the Regulation Z § 226.4(a)(1), includes "fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor . . . [r]equires the use of a third party as a condition of or an incident to the extension of credit."

161.   The supposed Membership Fees charged by Defendant MoneyLion Plus are, in fact, disguised finance charges:

   (a) the Membership Fees are payable by Plaintiff and the Class Members as a condition of, and incident to, the extension of credit;

   (b) Plaintiff's and the Class Members' obligation to pay them depends only on whether they have an outstanding Loan—not on whether actually receive any Plus Member Benefits;

   (c) MoneyLion charges and collections Membership Fees to compensate and insure itself against borrowers' risk of defaulting on a Loan;

162.   The Truth in Lending Disclosure statement issued in conjunction with this consumer credit transaction violated therefore requirements of Truth in Lending and

Regulation Z by failing to include in the finance charge certain charges imposed by MoneyLion and payable by Plaintiff and the Class Members incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 226.4, including by:

(a) Inaccurately disclosing a finance charge of approximately $16.66 for the Loan, when the true finance charge exceeded $364.66, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z § 226.18(d);

(b) Inaccurately expressing the finance charge as an "annual percentage rate" of 5.99%, when the true annual percentage rate exceeded 72%, in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(e);

163.   As a result of the foregoing violations of the Truth in Lending Act and Regulation Z, Plaintiff and the Class Members are entitled to recover actual and statutory damages, attorneys' fees, and costs.

## JURY DEMAND

164.   Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class Members;

(b) For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

(c) For an order finding in favor of Plaintiff and the Class Members on all counts asserted herein;

(d) For compensatory (including but not limited to emotional distress), statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief, including public injunctive relief, as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class Members their reasonable attorneys' fees and expenses and costs of suit.

Dated: July 25, 2019.                    Respectfully Submitted,

/s/ Kolin C. Tang
Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
1401 Dove Street
Suite 540
Newport Beach, CA 92660
Phone: 323-510-4060
Fax: 866-300-7367
Email: ktang@sfmslaw.com

James C. Shah (SBN 260435)
**SHEPHERD FINKELMAN MILLER & SHAH, LLP**
35 E. State St. Media, PA 19063
Telephone: 610-891-9880
Facsimile: 866-300-7367
Email: jshah@sfmslaw.com

John F. Edgar (PHV forthcoming)
Michael R. Owens (PHV forthcoming)
**EDGAR LAW FIRM LLC**
2600 Grand Blvd., Ste. 440
Kansas City, MO 64108
Telephone:   (816) 531-0033
Facsimile:   (816) 531-3322
Email: jfe@edgarlawfirm.com
Email: mro@edgarlawfirm.com

*Attorneys for Plaintiff, individually and on behalf of all others similarly situated*