Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
1401 Dove Street
Suite 540
Newport Beach, CA 92660
Phone: 323-510-4060
Fax: 866-300-7367
Email: ktang@sfmslaw.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGGIEH DICARLO, Individually and On Behalf of All Others Similarly Situated, <br><br>       Plaintiff, <br><br>   vs. <br><br> MONEYLION, INC., MONEYLION OF CALIFORNIA LLC, ML PLUS LLC, and ML WEALTH, LLC, <br><br>      Defendants. | Case No. 19-cv-01374-PSG-SHK <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR PUBLIC INJUNCTIVE RELIEF, DAMAGES, AND RESTITUTION** <br><br><br> **Dated: October 15, 2019.** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Marggieh DiCarlo ("Plaintiff"), on behalf of herself and all others similarly situated, files this First Amended Class Action Complaint for Public Injunctive Relief, Damages, and Restitution (the "Complaint") against Defendants, MoneyLion, Inc., MoneyLion of California, LLC, ML Plus LLC, and ML Wealth, LLC ("MoneyLion" or "Defendants"), and in support of the same, states and alleges as follows:

## **INTRODUCTION**

1.      Defendants represent their MoneyLion smartphone application (the "MoneyLion App" or "App") as a one-stop financial-services shop for the 70% of Americans who live paycheck to paycheck and cannot afford traditional bank fees.[1] Through the App, MoneyLion offers a bank account, an investment account, loans, cash advances, loyalty rewards, automated feedback on spending habits, and tidbits of personal finance advice and trivia.

2.      MoneyLion promised that its App and affiliated consumer finance products would offer "Americans a revolutionary new way to get ahead" financially,[2] by leveraging "innovative technological approaches to improving customer outcomes."[3]

3.      This promise has gone unfulfilled—instead, MoneyLion has opted to engineer a high-tech debt trap, one that that allows it to raid consumers' bank accounts under the guise of collecting monthly "membership fees" and deny consumers'

---

[1] Donna Fuscaldo, *MoneyLion Raises $160 Million At A Valuation Nearing $1 Billion*, Forbes.com (July 23, 2019), available at https://www.forbes.com/sites/donnafuscaldo/ 2019/07/23/moneylion-raises-160-million-at-a-valuation-nearing-1-billion/#1fdc5b78a527.

[2] *MoneyLion Announces America's Most Powerful and Rewarding Financial Membership*, BusinessWire (October 22, 2018), available at https://www.businesswire.com/news/home/2018 1022005516/en/MoneyLion-Announces-America%E2%80%99s-Powerful-Rewarding-Financial-Membership.

[3] *MoneyLion wins Celent Model Bank Award for Financial Wellness*, MoneyLion.com (April 25, 2018), available at https://www.moneylion.com/learn/moneylion-wins-celent-model-bank-award-for-financial-wellness/.

desperate pleas to escape.  MoneyLion has indeed leveraged technology—just not to improve consumer outcomes.  MoneyLion has instead employed it to perpetrate its debt trap scheme on a massive scale.

4.     MoneyLion's scheme has supplied it with a healthy cash flow, earning the company much fanfare in the venture capital world.  To date, MoneyLion has secured more than  $227 million in venture capital funding—including closing a $160 million Series C round on July 22, 2019—as well as a $1 billion valuation.[4]

5.     The consumer side of the experience, by contrast, has presented no cause for celebration.

6.     A brief sampling of customer feedback on various websites and social media reveals the general flavor of consumers' experiences with MoneyLion:  "*they are stealing money*"; "*This company is a Bully and a predator to already credit vulnerable customers*"; "*They have false advertising*"; "*Thieves*"; "*Total nightmare*"; "*This is theft*"; "*This is UNETHICAL and DECEPTIVE*"; "*I have had enough of the abuse from this company*"; "*This is fraud*"; "*Its a trap dont do it*"; "*Shame Shame Shame*"; "*Run fast AWAY from this company!!*"; "*This is a scam!*"; and so on.

7.     The rest of this Complaint explains why.

## PARTIES

8.     Plaintiff is an individual resident of Upland, California and, thus, a citizen of California.  A licensed cosmetologist, Plaintiff took out a loan with MoneyLion on July 26, 2018, in hopes of building her credit so that she could open her own salon.

9.     Defendant, MoneyLion, Inc., is a Delaware corporation with its principal place of business located, upon information and belief, at 30 W. 21st St., Flr. 9, New York City, NY 10010.  MoneyLion, Inc., thus, is a citizen of Delaware and New York.

---

[4] Donna Fuscaldo, *MoneyLion Raises $160 Million At A Valuation Nearing $1 Billion*, Forbes.com (July 23, 2019), available at https://www.forbes.com/sites/donnafuscaldo/2019/07/23/moneylion-raises-160-million-at-a-valuation-nearing-1-billion/#1fdc5b78a527.

10.     MoneyLion, Inc. is the parent company and sole member of Defendants MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC, and, upon information and belief, directs and manages the operations of Defendants, MoneyLion of California, LLC, ML Plus, LLC, and ML Wealth, LLC.

11.     Defendant, MoneyLion of California, LLC ("MoneyLion of California"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010.  MoneyLion of California, thus, is a citizen of Delaware and New York.

12.     MoneyLion of California is a licensed finance lender by the California Department of Finance (License No. 603L583).  MoneyLion of California serves as the lending subsidiary through which MoneyLion makes loans to California residents, including Plaintiff.

13.     Defendant, ML Plus, LLC ("ML Plus"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010. ML Plus, thus, is a citizen of Delaware and New York.

14.     Upon information and belief, ML Plus is the MoneyLion subsidiary that operates the MoneyLion Plus membership program.

15.     Defendant, ML Wealth, LLC ("ML Wealth"), is a Delaware corporation with its principal place of business located at 30 W. 21st St., Flr. 9, New York City, NY 10010.  ML Wealth, thus, is a citizen of Delaware and New York.

16.     ML Wealth is a registered investment advisor with the Securities and Exchange Commission.  ML Wealth manages the assets held in Plaintiff's MoneyLion Investment Account.

17.     All Defendants work in concert to operate the MoneyLion App and related services and to execute the scheme described herein.

## JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over Defendants because they maintain offices in California, have engaged in business activities in, and directed to,

the State of California and within this judicial district, and/or have knowingly committed unlawful acts within and directed at the State of California.

19.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) ("CAFA") because Plaintiff seeks to proceed under Rule 23 of the Federal Rules of Civil Procedure, diversity of citizenship exists between at least one member of the putative class and at least one Defendant, and the amount placed in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

20.    Alternatively, this Court has original jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's Count IV arises under the laws of the United States, and supplemental jurisdiction over the state law claims exists under 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy.

21.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because Plaintiff resides here and, thus, a substantial part of the events or omissions giving rise to these claims occurred here and/or because a substantial part of the property that is the subject of this action is situated here.

22.    Venue is this district is also proper under 28 U.S.C. § 1391(b)(3) because each Defendant is subject to the Court's personal jurisdiction in this district with respect to this action.

## GENERAL ALLEGATIONS
### *I.  Plaintiff's Experience with MoneyLion*

23.    In early 2018, Plaintiff began receiving internet advertisements for MoneyLion, including for its signature $500 5.99% APR Credit Builder Loan℠.

24.    Plaintiff, a licensed hair stylist by trade, planned to open her own salon in the next couple of years.  The product appealed to her.  In order to achieve her goals of opening her own salon, she would need to secure financing.  And in order to qualify for financing, she needed a positive credit history.

25.     Accordingly, in July of 2018, Plaintiff downloaded the MoneyLion App and attempted to obtain the $500 5.99% APR Credit Builder Loan$^{SM}$.  The App informed her that, to be eligible for the $500 5.99% APR Credit Builder Loan$^{SM}$, she first must enroll as a member in the MoneyLion Plus program.

26.     In its advertising, on the App, and in the MoneyLion Plus Membership Program and Services Agreement Terms and Conditions (the "Plus Agreement," attached as Exhibit A) presented to Plaintiff before enrolling, MoneyLion represents that membership in its Plus program provides several benefits (in addition to eligibility for the $500 5.99% APR Credit Builder Loan$^{SM}$), including:  a "Weekly Credit Score Refresh," "Automated deposits into Investment Account," "Daily Cash-Back to Investment Account," and "access to financial advice, social-media based customer service, and more."  *See* Exhibit A, p. 2.

27.     The Plus Agreement also states that MoneyLion Plus members "are required to pay a monthly twenty nine dollars ($29) Membership fee to Company . . . , which may be adjusted from time to time," ("Membership Fees") in addition to paying "fifty dollars ($50) each month ('Required Monthly Investment') into Your Investment Account."  *See* Exhibit A, pp. 4, 8.

28.     The Plus Agreement also provides that "[t]his Agreement may be terminated by either party, with or without cause, by notice to the other Party, subject to the specific terms and restrictions contained in this Membership Agreement and in the Advisory Agreement."   The only limitations the Plus Agreement places on Plaintiff's right to cancel are the following:

    i.  You may not terminate Your Membership unless Your Membership has been active for at least thirty (30) days;

    ii.  You will be charged a $0.25 withdrawal service charge by the Broker (the "Withdrawal Charge") when You terminate Your Investment Account. Any non-termination withdrawal will also be subject to the Withdrawal Charge. Adviser is not paid any portion of the Withdrawal Charge;

iii.   Withdrawals for Plus Program members will not be processed if doing so would result in Your Investment Account retaining a value of less than $150 (the "Minimum Balance"). For Plus Program members, the remaining $150 may be withdrawn only upon account termination; and

iv.   If You are a Plus Program member and if You have pledged the cash and securities in Your Investment Account to an Affiliated Lender or bank as collateral for a Loan pursuant to the terms of a Loan Agreement or to Company as collateral for a Cash Advance, You will not be permitted to terminate Your Investment Account and will be permitted to withdraw only such amounts that would result in Your Investment Account maintaining a balance which equals or exceeds Your outstanding loan balance. The Minimum Balance still applies.

*See* Exhibit A, p. 9.

29.   No terms of the Plus Agreement purport to restrict a member's ability to cancel their membership due to an outstanding Loan balance or unpaid Membership Fees.

30.   Because she needed the Loan—and because she had no reason to believe she could not cancel the MoneyLion Plus membership if she later decided that it was prohibitively expensive or otherwise not worthwhile—Plaintiff decided to give it a try. She enrolled in the MoneyLion Plus program on July 19, 2018.

31.   To complete her enrollment in the MoneyLion Plus program, Plaintiff was also required to sign—in addition to the ML Plus Agreement—four other contracts:  an investment advisory agreement (the "Advisory Agreement," attached as Exhibit C) with ML Wealth, LLC, the subsidiary serving as the advisor to the MoneyLion Investment Accounts; a "Broker Agreement" with related party DriveWealth, LLC; an "Automatic Payment Authorization" (attached as Exhibit E) granting ML Plus and its affiliates authority to initiate electronic fund transfers from the members bank accounts for Membership Fees, Loan payments, and "any additional fee services"; and an

"Agreement for Resolving Disputes" (attached as Exhibit D) purporting to require Plaintiff to submit any disputes against the MoneyLion-affiliated entities to mandatory arbitration, subject to certain exceptions (which, as described below, is unenforceable).

32.     On July 26, 2018, one week after enrolling in MoneyLion Plus, Plaintiff applied for and received the $500 5.99% APR Credit Builder Loan$^{SM}$.

33.     To finalize the transaction, MoneyLion presented Plaintiff with the MoneyLion Installment Loan Pledge and Security Agreement (the "Loan Agreement," attached as Exhibit B).   The Loan Agreement contained the following Truth in Lending Act Disclosures ("TILA Disclosures"), purportedly apprising Plaintiff of the cost of borrowing:

**TRUTH IN LENDING ACT DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount your credit will cost you. | Amount Financed The amount of credit provided to you. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.99% | $16.66 (e) | $500.00 | $516.66 (e) |

Exhibit B (Loan Agreement), p. 2.

34.     Under the Loan Agreement, Plaintiff agreed to make 12 monthly payments of $43.06:

| Your payment schedule will be: | | |
|---|---|---|
| Number of Payments | Amount of Payments (e) | When Payments Are Due |

| Number of Payments | Amount of Payments | When Payments are Due (the "Due Dates") |
|---|---|---|
| 1 | $43.06 | 2018-08-31 |
| 1 | $43.06 | 2018-09-28 |
| 1 | $43.06 | 2018-10-31 |
| 1 | $43.06 | 2018-11-30 |
| 1 | $43.06 | 2018-12-31 |
| 1 | $43.06 | 2019-01-31 |
| 1 | $43.06 | 2019-02-28 |
| 1 | $43.06 | 2019-03-29 |
| 1 | $43.06 | 2019-04-30 |
| 1 | $43.06 | 2019-05-31 |
| 1 | $43.06 | 2019-06-28 |
| 1 | $43.00 | 2019-07-31 |

*See* Exhibit B, pp. 2-3.

35.     Nothing in the Loan Agreement advised Plaintiff that she had committed to paying Membership Fees during the entire life of the Loan.

36.     And, while Plaintiff agreed to pledge her Investment Account as security for the Loan, nothing in the Loan Agreement or any other Agreement authorized MoneyLion to use her Investment Account as security for her Membership Fees.

37.     For each of the first four months of Plaintiff's Loan and Plus Membership, MoneyLion successfully withdrew by electronic fund transfer the $43.06 Loan payment, the $29.00 Membership Fees, and the $50.00 mandatory Investment Account contribution.

38.     In November of 2018, however, MoneyLion's attempted electronic funds transfers from Plaintiff's bank account, both for the Loan payments and the Membership Fees, failed due to insufficient funds in Plaintiff's primary account. Plaintiff, therefore, fell both behind on her Loan and, in MoneyLion's view, her Membership Fees.

39.     As a result of the failed payments, MoneyLion suspended Plaintiff's access to all MoneyLion Plus membership benefits, like the opportunity to earn "Daily Cashback" and receive weekly credit score updates.

40.     Despite the fact that MoneyLion did not provide her access to any membership benefits during the months corresponding to her missed payments, MoneyLion nonetheless treated Plaintiff's missed Membership Fees as due and owing.

41.     Thereafter, from December of 2018 through much of February 2019, Plaintiff attempted repeatedly to call MoneyLion's customer support line in order to make arrangements to pay her Loan (but cancel her MoneyLion Plus Membership and Investment Account contributions).

42.     Each time, Plaintiff encountered a labyrinthian menu of automated touch-tone options, with each selection leading to a new sub-menu. None of the options were responsive to Plaintiff's needs. Not once during this time was Plaintiff able to speak to a human support representative regarding her concerns.

43.   Her calls were also frequently disconnected, a phenomenon widely reported by users in reviews and complaints about MoneyLion's services.

44.   Plaintiff tried to contact MoneyLion support again, this time via email on February 12, 2018, pleading to cancel her MoneyLion Plus membership.  Plaintiff requested, quite reasonably, that the approximately $210.00 that MoneyLion held in her Investment Account be applied to satisfy her outstanding Loan payments.



I want to pay my loan. But I dont want to continue membership. I cant afford that my boyfriend  lost his job and I have had to help more.  I didnt mean to not pay my loan.  I cant pay it in full but can continue with the 43.  Also the 210 in my investment . Can it just be applied to the loan please.

Marggieh DiCarlo

*See* Exhibit F, p. 2.

45.   Plaintiff was greeted three days later, on February 15, 2019, with an automated email response from MoneyLion's customer service.  The email was utterly nonresponsive to Plaintiff's concerns.

46.   Instead it simply contained a boilerplate recitation of MoneyLion's favorite phrase—"if you currently have an active Plus loan, you must first pay off the outstanding loan balance before you can cancel your membership"—and also advised Plaintiff that she must call MoneyLion customer support to cancel her Plus Membership.  *See* Exhibit F, p. 3.

47.   Plaintiff sent another email to MoneyLion's customer support on March 4, 2019.  *Id.*, p. 4.  Two days later, Plaintiff received an automated response identical to the one she received on February 15th—nothing more.  *Id.*, p. 5.

48.    Increasingly desperate, Plaintiff took her concerns to social media:




**Ttlghairparlour**
@ttlghairparlour

Follow

I have had the most awful experience with
@MoneyLion I have emailed and called and
tried their live chat. With no help to make
payments on their loan. I'm trying to pay
them and they won't take payment unless I
pay membership fees ?! I don't want the
membership

9:54 AM - 7 Mar 2019

*Id.*, p. 6.

49.    But Plaintiff's Twitter post simply drew another automated response from MoneyLion:



**MoneyLion** @MoneyLion · Mar 8

Replying to @ttlghairparlour

Hello! Were sorry to hear that you have had a bad experience with Moneylion.
For the security of your account, we'd like to discuss this over a PM  so we may
further assist you accordingly. We look forward to hearing from you.

*id.*, followed by MoneyLion blocking her account.



Welcome to
**America's most
powerful financial
membership**

**MoneyLion**
@MoneyLion

You are blocked from following @MoneyLion and
viewing @MoneyLion's Tweets. Learn more

*Id.*, p. 7.

50.    Still desperate, Plaintiff tried a new strategy:  she pressed the touchtone command for new customers "seeking to obtain a MoneyLion Plus Loan."  This time, she was immediately routed to a live human customer support representative.

MoneyLion apparently will only offer responsive, prompt, and human support to consumers seeking to enter—not manage or escape—its debt trap.

51.    On the call, a MoneyLion customer support representative advised Plaintiff that she was not eligible to cancel her MoneyLion Plus membership because she had an outstanding Loan balance.

52.    The MoneyLion customer support representative also refused Plaintiff's request to make payments on her Loan, stating that Plaintiff was required to pay all past due Membership Fees and Investment Account contributions before she could pay on her Loan—a sum which then stood at approximately $316.00.  Plaintiff was unable to do so.

53.    Nor would MoneyLion permit Plaintiff to use the funds in her Investment Account to pay the Loan.

54.     MoneyLion does not allow consumers any access to funds held in their Investment Accounts if they have an outstanding Loan or past due Membership Fees—even for the purpose of paying such outstanding Loan or past due Membership Fees.

55.    None of the conditions described above were ever disclosed to Plaintiff in her Agreements or otherwise.

56.    Unable to clear MoneyLion's insurmountable hurdles to cancelling her MoneyLion Plus membership, Plaintiff was ultimately forced to close her bank account to protect herself from MoneyLion's monthly onslaught of automated debits for Membership Fees and Investment Contributions, as well as the bank overdraft fees it caused.

57.    To date, according to MoneyLion, Plaintiff owes $948.00 in past-due Membership Fees, representing eleven months' worth of fees (during which time Plaintiff received nothing in the way of membership benefits).

58.    And she must pay that amount, according to MoneyLion, before she is allowed the privilege of: making payments on her Loan; accessing the $223.62 in her Investment Account; canceling her MoneyLion Plus membership; stopping the

onslaught of monthly Membership Fees; and—ultimately—escaping the complete and utter financial nightmare that MoneyLion Plus membership has wrought on her life.

## II.   *The Anatomy of a Debt Trap*

59.    As it turns out, Plaintiff fell victim to a scheme MoneyLion has perpetrated against consumers—including California residents—on a massive scale. The rest of this section explains how MoneyLion's scheme works.

**Step 1:   Entice Customers to Enroll in MoneyLion Plus By Claiming That Membership Will Make Them Eligible for Cheap Loans—Loans That Are Falsely Represented to be 5.99% APR**

60.    MoneyLion offers a free version of its services called "MoneyLion Core," and a paid "members only" version of its services called "MoneyLion Plus."

61.    As described above, enrollment in MoneyLion Plus requires subscribers to pay a monthly membership fee of $29.00 ("Membership Fee"), in addition to depositing a minimum of $50.00 into the MoneyLion Investment Account (together, the "Plus Fees"), which is managed by a MoneyLion affiliate, ML Wealth LLC.

62.    If a user enrolls in MoneyLion Plus, the $29.00 Membership Fee and the $50.00 Investment Account contribution are automatically debited every month from a user's primary bank account (which users are required to give MoneyLion access to when signing up for an account).

63.    MoneyLion entices costumers to "upgrade" to the MoneyLion Plus ("Plus") membership program through the promise of its $500 5.99% APR Credit Builder Loans$^{SM}$ (the "Loan"), which it claims to offer with "No Credit Check" and "No Monthly Service Fees."

64.    Indeed, the only material differences between the free MoneyLion Core version and the subscription-based MoneyLion Plus version is that a Plus member can get the Loan, and MoneyLion gets its Membership Fees.

65.     Below is a comparison of the features of the free MoneyLion Core version and the subscription-based MoneyLion Plus version, taken straight from Plaintiff's Plus Agreement:

| Feature | Available in Core? | Available in Plus? |
|---|---|---|
| Investment Account | Yes | Yes |
| Checking Account | Yes | Yes |
| Credit Monitoring Tools | Yes | Yes |
| Weekly Credit Score Refresh | Yes | Yes |
| **Monthly Credit Reporting to Bureaus** | **No** | Yes |
| **Members Only Facebook Group** | **No** | Yes |
| **Automated Deposits into Investment Account** | **No** | Yes |
| Financial Literacy Tips | Yes | Yes |
| **Low-APR Loans** | **No** | Yes |
| **Daily Cash-Back to Investment Account** | **No** | Yes |
| Rewards Points Redeemed at Retailers Nationwide | Yes | Yes |
| Referral Bonuses | Yes | Yes |

*See* Exhibit A, p. 2.

66.     Of the five purported differences between the free and paid versions, two relate to Loans (eligibility for a Loan and reporting of the Loan to credit bureaus), two relate to Membership Fees (as "automated deposits into Investment Account" is just a way of creatively and deceptively phrasing MoneyLion's forced $50 minimum contribution as a benefit, and any "daily cash back" is simply a partial rebate of Membership Fees).

67.     The only unrelated benefit—access to a special Facebook Group—costs MoneyLion nothing to provide; is wholly immaterial to users' enrollment decisions; and, upon information and belief, is used by less than 1% of MoneyLion Plus members.

68.     So if a consumer joins MoneyLion Plus, it's invariably because he or she sought access to the $500 5.99% APR Credit Builder Loan.

69.     But the 5.99% APR figure is misleading—it does not account for the significant cost of Membership Fees.

70.   MoneyLion's treatment of the Membership Fees is foreign to any reasonable consumer's understanding of the concept.

71.   For example, if a borrower misses a Membership Fee payment—whether because of insufficient funds, a payment processing error, a desperate stop payment request to their primary bank, or another reason—MoneyLion will "pause" the consumer's MoneyLion Plus membership.   When a consumer's membership is "paused," he or she is unable to access any of the features or benefits available through MoneyLion Plus.

72.   Yet MoneyLion still treats a missed Membership Fee payment as a debt due and owing to the company—even though MoneyLion suspends the membership benefits of any consumer who is behind on their Membership Payments.   In other words, even though MoneyLion has provided zero MoneyLion Plus member benefits to a consumer during that month, it nevertheless demands payment its $29.00 Membership Fee.

73.   It would be reasonable for MoneyLion either to (a) suspend benefits for a particular month if a consumer failed to pay for them that month or, alternatively, (b) provide membership benefits for that month but treat the unpaid Membership Fees as a due and owing debt to the company.   But in no reasonable world can MoneyLion provide no benefits for a given month yet simultaneously charge and collect Membership Fees for that same month (or months).

74.   A comparison to subscription-based media provider Netflix provides a useful illustration of the unusual nature of MoneyLion's Membership Fees (indeed, the comparison is one that MoneyLion frequently invokes itself, touting its Plus service as the "Netflix of the financial industry"[5]).   If a subscriber is unable to pay her monthly

---

[5] *See, e.g.*, Donna Fuscaldo, *MoneyLion Raises $160 Million At A Valuation Nearing $1 Billion*, Forbes.com (July 23, 2019), available at https://www.forbes.com/sites/donnafuscaldo/2019/07/23/ moneylion-raises-160-million-at-a-valuation-nearing-1-billion/#1fdc5b78a527 ("'[T]he idea of being the Costco or Netflix of the financial industry is an important theme,' said Choubey"); *see also* Manish Singh, *US Mobile Bank*

fee, Netflix might (a) suspend her access to its content until she resumes payment, or (b) permit her to access its content, but treat fees payable during that billing cycle as due and owing.  It will not, however, both suspend her access to content *and* still assess and collect subscription fees while her account is suspended.[6]

75.    Moreover, MoneyLion will not resume a member's access to Plus member benefits until *all* supposedly delinquent Membership Fees are paid in full.  For example, if a borrower misses a March membership payment, but MoneyLion successfully auto-debits $29.00 from her account in each of the following nine months, her membership will have remained suspended during the entirety of that period, notwithstanding the fact that she has remitted $261 in Membership Fees to MoneyLion.  Essentially, she would have paid $261 to MoneyLion and received absolutely nothing in return.

76.    Only by paying the cumulative sum of all past due Membership Fees can a member regain her status as a "member in good standing," even though she will not—and indeed, cannot—receive "past due" membership benefits in return.

77.    MoneyLion's bizarre (and unconscionable) treatment of Membership Fees only makes sense when viewed in the context of their true purposes: to function as disguised interest, and to perpetuate the Membership Fee trap.

78.    MoneyLion has admitted to consumers that it requires payment of Membership Fees for the life of the Loan because MoneyLion does not perform credit

---

*MoneyLion Raises $100 Million at 'Near Unicorn' Valuation*, TechCrunch.com (June 22, 2019), available at https://techcrunch.com/2019/07/22/us-mobile-bank-moneylion-raises-100-million-at-near-unicorn-valuation/ ("'We think of ourselves approaching financial services just like Netflix approaches content. We want to keep users hooked to the platform,' [MoneyLion founder and CEO, Dee Choubey,] said.").

[6] *See generally* "Billing and Cancellation," Netflix Terms of Use, § 3, available at https://help.netflix.com/legal/termsofuse.

---

checks on borrowers.[7]  The Membership Fees therefore act to offset MoneyLion's risk of default by the borrower—a defining function of interest charges.

79.    As a result of the foregoing practices, taking the Loan quickly proves to be a costly decision for a consumer.

### Step 2:  Start Raiding Consumers' Accounts for Membership Fees

80.    A consumer who has opted to take a $500 5.99% APR Credit Builder Loan℠ will soon notice that—between the $29.00 Membership Fee, the $50.00 mandatory Investment Account contribution, and the $43.06 Loan payment—more than $122.06 in MoneyLion-initiated electronic funds transfers is vanishing from his or her primary bank account each month.

81.    Unsurprisingly, given the financial profile of consumers who MoneyLion admittedly targets for the 5.99% APR Credit Builder Loan℠ in the first instance, a $122.06 monthly expense presents a serious financial hardship (or at a minimum, a substantial inconvenience).

82.    Reasonably concluding that, while they are willing to make their required payments on the Loan, an additional $79.00 for access to a Facebook Group and slightly-more frequent credit score updates is a bit steep, members then attempt to cancel their MoneyLion Plus membership.

### Step 3:   Invoke Undisclosed Cancellation Criteria to Prohibit Consumers from Canceling their MoneyLion Plus Memberships; Continue Raiding Consumers' Accounts for Membership Fees

83.    Only then do they learn that MoneyLion will not allow consumers to cancel their MoneyLion Plus membership if they have an outstanding Loan balance, as reflected in the consumer complaints excerpted below (and many others just like them):

---

[7] *See*, *e.g.*, <u>CFPB Complaints</u>, Complaint No. 3034700, submitted October 2, 2018 ("I called [MoneyLion] and was explained that its a membership fee since they dont [*sic*] run credit.").

I was approved easily for a small {$500.00} loan as part of the MONEY LION PLUS PROGRAM and paying XXXX a month - I have no problem with that as I'm working to build my credit score while on a humble XXXX income I had to turn to 5 years ago as my condion worsend.. ***Hower part of the money Lion plus program was they also deduct from my account ANOTHER {$79.00} -broken down into XXXX as a monthly membership fee and a XXXX into a "investment" account -*** The loan I can handle ... My complaint is the other XXXX that is almost double my loan payment -- it's tightened up my budget beyond being doable in life needs - since the other XXXX is really my money voluntary put in a investment - ***I called them, and asked to close my membership, send me The XXXX ( built up in "investment" ) that's mine, OR put it towards loan payment - seems fair and morally even I pay what's lended to me They said no way ... it will ALL continue till loan payed..***[8]

Hi Good Afternoon, On XX/XX/XXXX in response to an advertisement I received from Moneylion, I signed up and was approved for a cost-effective short-term loan of {$600.00} at a 5.99 %. I reviewed in great detail every section of the contract (attached) before signing. I was told that {$23.00} would be deducted weekly (every Friday ) for 26 weeks, with a total payment of {$600.00}. After the first withdrawal on XX/XX/XXXX, I noticed a second withdrawal on the same day for {$31.00}. And this occured the following week as well - {$23.00} + {$31.00}. When I inquired with Moneylion, ***I was then informed that a membership fee ( that was initially advertised as {$79.00} initially ), is actually a recurring fee for the entire duration of your repayment, bring a total membership fee to {$31.00} x 26 weeks = {$830.00}.*** Nowhere in my contract was this ever stated or brought to my attention during the enrollment process. I am certain I would never sign up for this having been told so at the onset. I have since blocked the additional payment of {$31.00} as this was never communicated to me, but I shouldn't

---

[8] *Consumer Financial Protection Bureau Complaint ("CFBP")*, Complaint No. 3172846, submitted March 7, 2019 (emphasis added).

have to do so.[9]

84.     This practice was never disclosed during the process of enrolling for MoneyLion Plus or applying for the Loan, including in any of the five separate Agreements MoneyLion requires members to sign during the enrollment process.

85.     Worse yet, MoneyLion also refuses to allow consumers to cancel their MoneyLion Plus membership if they have past-due Membership Fees.

86.     MoneyLion uses the existence of past due Membership Fees as grounds for denying consumers' requests to cancel their MoneyLion Plus membership, thereby justifying (at least in Defendants' view) MoneyLion's continued extraction of Plus Membership Fees from consumers' bank accounts, month after month, potentially into perpetuity.

87.     This practice, too, was never disclosed during the process of enrolling for MoneyLion Plus or applying for the Loan, including in any of the five separate Agreements MoneyLion requires members to sign during the enrollment process.

**Step 5**:  **Impose Insurmountable Barriers to Satisfying MoneyLion's Undisclosed Cancellation Criteria; Continue Raiding Consumers' Accounts for Membership Fees**

88.     As explained above, customers without the financial means to make a lump-sum payment sufficient to eliminate their outstanding Loan balance have no prayer of successfully cancelling their MoneyLion Plus membership and escaping the Membership Fee trap.  MoneyLion will summarily refuse their requests to cancel the Plus Membership because they have an "active loan."

89.     For customers who can pay in lump sum their entire outstanding Loan balance, MoneyLion erects numerous additional barriers to prevent them from cancelling their membership and escaping the Plus Membership Fee trap.   These barriers, either individually or in combination, often prove insurmountable.

---

[9] *CFPB Complaint*, Complaint No. 2866241, submitted April 5, 2018 (emphasis added).

90.    **Requiring Full Payment of All Past-Due Membership Fees** *And* **Investment Account Contributions.**  MoneyLion requires that, in addition to paying off the Loan and all past-due Membership Fees, *a member must also pay any missed $50.00 monthly Investment Account Contributions before MoneyLion will permit her to terminate her MoneyLion Plus membership.*  This amount alone can easily exceed the principal value of the Loan.

91.    In Plaintiff's case, as of the date of this filing, MoneyLion demands that she pay $948.00 in Membership Fees and Investment Account contributions (*i.e.*, ($29.00 + $50.00) x 12 months), just for the "privilege" of canceling her membership—an amount that has increased to from the $711.00 supposedly owed at the time Plaintiff filed her original Complaint fewer than three months ago.

### Plaintiff's "Past Due" Membership Fees



*See* Exhibit G, pp. 2-4.

92.    MoneyLion represents that it will liquidate and close a member's Investment Account after he cancels his MoneyLion Plus membership.  Thus, there is

no sensible purpose for requiring a member to make Investment Account contributions before he may cancel his membership, only to return those very same contributions upon cancellation.  The only rational purpose the practice could serve is to create an additional barrier to cancelling the MoneyLion Plus membership by increasing the lump-sum payment required for a member to become eligible to cancel.

93.   MoneyLion will continue attempting to debit Membership Fees and Investment Account contributions each month.  If the fund transfer is successful, MoneyLion is enriched $29.00, while the consumer receives nothing—no access to any "Plus perks" or any reduction in the outstanding Loan balance.  If the fund transfer is unsuccessful, MoneyLion adds the unpaid fees the customer's past-due Membership Fee balance, further increasing the cost of cancelling.

94.   MoneyLion repeats this process each ensuing month.

95.   With each passing month, the consumer's prospects of bringing her membership "current," and thereby escaping the Membership Fee trap, grow dimmer.

96.   **Refusing to Allow Customers to Use Their Investment Account Funds To Pay Their Loan Balance.**   As described above, $50 of the $79 in monthly Membership Fees are placed in consumers' MoneyLion-managed Investment Account.

97.   One potential silver lining for consumers victimized by MoneyLion's scheme is that they often accumulate a decent chunk of savings in their Investment Account contribution—typically several hundred dollars or more.

98.   But even the Investment Account has its own role in MoneyLion's scheme.

99.   First, it diminishes the quantity of available funds that borrower could otherwise use to pay off their Loan or Membership Fees (and thereby meet MoneyLion's undisclosed cancellation criteria).

100.   Indeed, consumers seeking to cancel their MoneyLion Plus membership have quite reasonably requested that MoneyLion liquidate their Investment Accounts and use the proceeds to pay off their Loan balance.

101.   No luck, says MoneyLion.  A user cannot access her Investment Account while she (a) has a loan, or (b) is behind on Membership Fees.  And, MoneyLion permits a borrower to use her Investment Account to pay off the Loan "*if and only if* the [L]oan has been delinquent for 90 days or more."[10]

102.   By that time, MoneyLion will have reported the Loan as seriously delinquent to all three credit bureaus, thereby decimating the consumers credit score— a disappointing result indeed for a borrower who took out a "*Credit Builder* Loan."

103.   MoneyLion will also have helped itself to at least three more rounds of Membership Fees during this time period.

104.   MoneyLion's second purpose for the Investment Account is to create a pool of funds, easily accessible by MoneyLion, from which MoneyLion can collect Membership Fees.

105.   Upon liquidating a user's Investment Account, MoneyLion will deduct from the proceeds all past-due Membership Fees before returning whatever is left to the consumer.

106.   Thus,   MoneyLion   uses   the   mandatory   Investment   Account contributions—not as a means to improve members' financial wellbeing by encouraging savings behavior—but, instead, as a means to secure its collection of past-due Membership Fees.[11]

107.   **Technical Obstacles and Wholly Unresponsive Customer Support.** Unsurprisingly, MoneyLion's purported enthusiasm for empowering consumers over

---

[10] *MoneyLion Response dated 6/28/19  to Anonymous BBB Complaint dated May 21, 2019*, available   at   https://www.bbb.org/us/ny/new-york/profile/consumer-finance-companies/moneylion-inc-0121-165324/complaints (accessed July 18, 2019) (emphasis added).

[11] *See*, *e.g.*, *MoneyLion Response dated 6/6/19  to Anonymous BBB Complaint dated May 15, 2019*,   available   at   https://www.bbb.org/us/ny/new-york/profile/consumer-finance-companies/ moneylion-inc- 0121- 165324/complaints (accessed July 19, 2019) ("With respect to his current Investment Account balance of $290.41,subject to securities market fluctuations, ***MoneyLion will offset the membership fees owed*** of $121.08 and provide a liquidation of proceeds to *** ******* of approximately $169.33." (emphasis added)).

their finances through technology does not extend to empowering them to cancel their MoneyLion Plus membership.

108.   Unlike enrolling in MoneyLion Plus, there is no mechanism by which a customer can to cancel her MoneyLion Plus membership through the MoneyLion App.

109.   Instead, MoneyLion attempts to funnel all cancellation requests (and all requests that would serve as a prerequisite to cancelation, such as paying off the Loan or past due Plus Fees) to its customer service telephone line.

110.   If a borrower attempts to submit a cancellation request via email, MoneyLion either will decline to respond at all, or will send an automated email response instructing the borrower to call MoneyLion's telephone helpline.

111.   If the borrower does telephone MoneyLion's customer support line to cancel his MoneyLion Plus membership, his efforts will almost inevitably fail.

112.   Below is a sampling of social media posts, *during a mere 15-day period*, describing consumers experiences when attempting to contact MoneyLion's customer support:

> *"Ive been waiting for a call back for going on 2 hours . . ."*; *"I was waiting 3 hours on the phone to speak to someone still no [one] picks up . . ."*; *"And, day 18, still no response to my emails . . ."*; *"WORST BANKING EXPERIENCE . . . the phone numbers hang up on me or won't connect to an agent after waiting an hour. You wont reply to support, or complaint issues. You wont respond to help tickets. I'm out of options . . ."*; *"got a rep after waiting 30 mins the first call but the call ended. No[]call back even though they verified call back number. Now this is my second attempt so I can pay much loan payment and no rep . . ."*; *"Hey Moneyl[ion] why aren't you answering the phone . . ."*; *"I have been trying to call all day. Waited 45min on my break and no answer on hold. Now after work been on hold for about 37 min . . ."*; *"EVERY TIME I CALL CUSTOMER SERVICE I CAN NEVER TALK TO AN ACTUAL PERSON"*; *"What is going on Moneylion, been contacting you guys for two days now, I need to pay off my loans and withdraw my investment . . ."*; *"I can't not believe how many timrs I been placed on*

*hold with mineylion . . .*"; "*I have tried for the past 4 days to speak with a Customer Service Representative . . .*"; "*Been waiting for someone to answer for a freaking hour now . . .*"; "*Nobody seems to want to help me after I sit on hold for 2 hours!!*"; "*Cannot get ahold of anyone at this company*"; "*Oh and [MoneyLion's] support never answers any questions, and their phone line puts you on hold (my record is 1.5 hours) with no one ever answering . . .*"; "*Your customer support sucks. It is an endless rabbit hole. One the phone and online*"; "*Customer service is impossible to reach. F[\*\*\*] your automated responses because almost everyone who has issues has filed their damn tickets and NOTHING HAPPENS*"; "*I'm closing my account after being on hold for 2.5 hours! This is ridiculous*"; "*No transparency, nobody to answer phone calls. Just keeping taking money and be quiet... wtf?!*"; "*After being on hold for almost a hour this morning we got zero things accomplished . . .*"; "*Care to explain this atrocious hold time?*"; "*ANSWER THE PHONE!!! 55 Minutes on hold is unacceptable!!*"; "*I swear @MoneyLion only has 2 employees. It shouldn't be this hard to speak with someone*"; "*Your hold times are ridiculous . . . Been on hold for 1 hr and nobody can even pick up a phone*"; "*And now trying to call @MoneyLion I can't even get past the menu as I get hung up on. Super disappointing*"; "*@moneylion customer support has hung on me SIX times today and I've yet to speak to anyone . . .*"; and so on.

*See generally* Exhibit G.

113.   In the meantime, MoneyLion's monthly onslaught of Membership Fees continues—each month, every month, with no end in sight.

## **CLASS ACTION ALLEGATIONS**

114.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed class defined as follows:

**All California residents who paid or were charged MoneyLion Plus membership fees at any time during the Class Period. The "Class Period" shall extend from November 1, 2017 to the day on which this Court certifies this case as a class action. Excluded from the Class**

**are:     Defendants, any entity in which any Defendants has a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and Class Counsel, Class Counsel's immediate family, and all persons employed by Class Counsel.**

115.   Plaintiff reserves the right to amend this class definition and, if deemed appropriate, to divide the Class into subclasses.

116.   Plaintiff seeks to recover, on behalf of herself and the Class Members, all principal, interests, and fees—including Membership Fees—paid by, charged to, or assessed to the Class Members in connection with a Loan extended by Defendants to Plaintiff and the Class Members.

117.   Plaintiff also seeks to recover any penalty or enhancement to which she and the Class Members are entitled, along with attorneys' fees and costs.

118.   Plaintiff further seeks a permanent injunction to ensure that the wrongful conduct described herein cease, with no threat of recurrence in the future.

### I. The Class Satisfies Rule 23's Requirements

119.   This action may properly be maintained as a class action under Federal Rule of Civil Procedure 23, because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

(a) **Numerosity:** There are approximately 52,000 California residents who are MoneyLion Plus members.  The Class as defined is therefore so numerous that joinder of all the Class Members is impracticable.

(b) **Commonality:** There are questions of law and fact common to Plaintiff and the Class that predominate over any questions affecting only individual Class Members. These common questions of law and fact include, but are not limited to:

   i.   Whether MoneyLion's general employment of a scheme calculated at every turn to maximize the period by which MoneyLion can justify

syphoning Membership Fees from a borrower's bank accounts is unfair;

ii.   Whether MoneyLion has contracted or received "charges," as the term is defined by Cal. Fin. Code § 22201, from Plaintiff and the Class Members at rates exceeding the amounts authorized under Cal. Fin. Code § 22201;

iii.  Whether MoneyLion has required in connection with, or incidental to, the making of consumer loans, that Plaintiff and the Class Members contract for or agree to purchase a MoneyLion Plus membership, in violation of the collateral sale prohibition set forth in Cal. Fin. Code § 22311 and § 22312;

iv.   Whether MoneyLion has employed a devise, subterfuge, or pretense to charge, contract, and receive greater interest, consideration, or charges than the amounts or types authorized by the California Finance Code, principally by disguising interest charges as "membership fees" and making them payable to Defendant ML Plus, a non-licensed lender;

v.    Whether MoneyLion has offered Plaintiff and the Class Members its Plus subscription on an automatic renewal or continuous service basis without presenting the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before enrollment, in violation of California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code § 17602(a)(1);

vi.   Whether MoneyLion has offered Plaintiff and the Class Members its Plus subscription on an automatic renewal or continuous service basis and charged Plaintiff and the Class Members' accounts without obtaining their affirmative consent to the renewal and/or cancellation terms MoneyLion applies in connection with its Plus subscription, in violation of California's ARL, Cal. Bus. & Prof. Code § 17602(a)(2);

vii.   Whether MoneyLion has offered Plaintiff and the Class Members its Plus subscription on an automatic renewal or continuous service basis without providing an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of California's ARL, Cal. Bus. & Prof. Code § 17602(a)(3);

viii.   Whether MoneyLion has offered Plaintiff and the Class Members its Plus subscription on an automatic renewal or continuous service basis without permitting consumers who accept its automatic renewal or continuous service offers online to terminate the automatic renewal or continuous service exclusively online, in violation of California's ARL, Cal. Bus. & Prof. Code § 17602(c);

ix.   Whether MoneyLion has denied Plaintiff and the Class Members their right to redeem their collateral by refusing to accept the tender of their Investment Accounts to satisfy their loan debt, in violation of Cal. Com. Code § 9623;

x.   Whether MoneyLion's practice of prohibiting Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until their entire loan balance is paid is unfair;

xi.   Whether MoneyLion's practice of prohibiting Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until all past-due Membership Fees are paid is unfair;

xii.   Whether MoneyLion's failure to disclose its practice of preventing Plaintiff and the Class Members from cancelling their MoneyLion Plus memberships until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid is unfair;

xiii.  Whether MoneyLion's practice of assessing Membership Fees for months during which Plaintiff and the Class Members received no membership benefits (because their membership benefits were "paused" by MoneyLion) is unfair;

xiv.  Whether MoneyLion's refusal to resume membership benefits in months that Plaintiff and the Class Members did, in fact, pay Membership Fees based on the existence of prior missed membership payments is unfair;

xv.  Whether MoneyLion's practice of requiring Plaintiff and the Class Members to endure inordinate wait times for customer service calls, and otherwise using unresponsive, incomprehensible, and technically deficient customer service systems to make process of cancelling one's MoneyLion Plus membership impossible or unduly burdensome is unfair;

xvi.  Whether MoneyLion's has falsely or misleadingly advertised its products as containing "no hidden fees";

xvii.  Whether MoneyLion has falsely or misleadingly advertised its Loans to carry an APR of just 5.99%;

xviii.  Whether MoneyLion charged and/or collected interest or fees at a usurious rate from Plaintiff and the Class Members;

xix.  Whether MoneyLion has violated the disclosure requirements of the Truth in Lending Act and Regulation Z;

xx.  Whether Plaintiff and the Class Members are entitled to injunctive relief restraining MoneyLion from engaging in the wrongful conduct alleged in this Complaint; and/or

xxi.  Whether Plaintiff and the Class Members are entitled to recover damages, restitution, enhancements, and penalties and, if so, the

nature, extent, and amount of such damages, restitution, enhancements, and penalties.

(c) **Typicality:** Plaintiff's claims are typical of the claims of the Class. MoneyLion's common scheme, practices, and course of conduct have caused Plaintiff and Class Members to sustain the same or similar injuries and damages.  Plaintiff's claims are thereby representative of, and co-extensive with, the claims of the Class Members.

(d) **Adequacy of Representation:** Plaintiff is a member of the Class; she does not have any conflicts of interest with other Class Members; and she will prosecute the case vigorously on behalf of the Class.  Counsel representing Plaintiff is competent and experienced in litigating large class actions, including those involving Cal. Bus. & Prof. Code §17200 and Cal. Civ. Code § 1750. Plaintiff will fairly and adequately represent and protect the interests of the Class Members.

(e) **Superiority of a Class Action:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all proposed Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each proposed Class member has been damaged and is entitled to recovery by reason of MoneyLion's unlawful, unfair, or otherwise improper practices. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.   The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible.   Individualized litigation increases the delay and expense to all Parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to

litigate their claims in the manner that is most efficient and economical for the Parties and the judicial system.

120.   In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, and, in turn, would establish incompatible standards of conduct for MoneyLion.

## II.   *MoneyLion's Arbitration Agreement Does Not Prohibit This Case from Proceeding in Court or as a Class Action*

121.   As a condition to enrolling in ML Plus and again upon obtaining the Loan, MoneyLion requires users to sign its "Agreements For Resolving Disputes," attached to this Complaint as Exhibit D.

122.   MoneyLion's Agreement for Resolving Disputes contains an arbitration clause, purporting to require members to submit all "Claims" (a term defined within the Agreement) against MoneyLion or its affiliates to binding arbitration.

123.   Paragraph 5 of the Agreement for Resolving Disputes purports to require Plaintiff to waive certain rights, including her right to:

> (C) PARTICIPATE IN A CLASS ACTION IN COURT OR IN ARBITRATION, EITHER AS A CLASS REPRESENTATIVE, CLASS MEMBER OR CLASS OPPONENT; (D) ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; OR (E) JOIN OR CONSOLIDATE CLAIM(S) INVOLVING YOU WITH CLAIMS INVOLVING ANY OTHER PERSON . . . .

*See* Exhibit D, p. 4, § 5.

124.   However, Paragraph 10 of the Agreement for Resolving Disputes contains a "poison pill" clause, which provides that "[i]f Section 5(C), (D) and/or (E) [*i.e.,* the provisions quoted in the preceding Paragraph] is declared invalid in a proceeding between you and us, without in any way impairing the right to appeal such decision, this entire Arbitration Provision (other than this sentence) shall be null and void in such proceeding." *See* Exhibit D, p. 5, § 10.

125.   Here, one or more of the clauses triggering the poison pill clause are invalid.   Specifically, the waivers in Section 5 and elsewhere contravene the strong public policy of California because it purports to waive Plaintiff's right to seek public injunctive relief under the CLRA, UCL, and/or California's False Advertising Law.   It is therefore invalid under *McGill v. Citibank*, N.A., 2 Cal. 5th 945 (2017).

126.   The unenforceability of one or more provisions of Section 5(C)-(E) activates the poison pill clause in Section 10, which in turn nullifies and voids the entire Agreement for Resolving Disputes—including the mandatory arbitration clause and class-action waiver.

127.   Accordingly, Plaintiff may seek the relief requested by this Complaint in this Court and on a class-wide basis.

## COUNT I
### Restitution and Private Injunctive Relief for
### Violations of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

128.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

129.   Plaintiff and Defendants are each "person(s)" within the meaning of California's Unfair Competition Law (Cal. Bus. & Prof. C. §§ 17200 *et seq.*).

130.   Cal. Bus & Prof. C. § 17204 authorizes a private right of action on both an individual and a representative basis.

131.   Cal. Bus. & Prof. C. § 17204, a provision of the Unfair Competition Law, confers standing to prosecute actions for relief not only on certain public enforcement officials, but on private individuals—*i.e.*, "any person acting for the interests of itself, its members or the general public."

132.   Thus, a private plaintiff who has suffered a financial injury may sue to obtain relief for others comprising the general public.

133.   California Bus. & Prof. Code § 17200 defines "unfair competition" to include any business act or practice that is "unlawful," "unfair," or "fraudulent," or that constitutes "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are stated in the disjunctive; thus, each of category wrongs independently suffices to support a claim for unfair competition.

134.   Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC, has engaged in *unlawful* business practices that include, but are not limited to, the following:

(a) Lending money in connection with a consumer loan, and contracting or receiving "charges," as the term is defined by Cal. Fin. Code § 22201, at rates exceeding the amounts authorized under Cal. Fin. Code § 22201;

(b) Requiring, in connection with or incidental to the making of consumer loans, that borrowers contract for purchase, or agree to purchase, a MoneyLion Plus membership, in violation of the collateral sale prohibition set forth in Cal. Fin. Code § 22311 and § 22312;

(c) The employment of a devise, subterfuge, or pretense to charge, contract, and/or receive greater interest, consideration, or charges than the amounts or types authorized by the California Finance Code, principally by disguising interest charges as "membership fees" and making them payable to Defendant ML Plus, a non-licensed lender;

(d) Violating California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code § 17600 *et seq.*, by offering its Plus subscription on an automatic renewal or continuous service basis to consumers in California and: (1) failing to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity to the request for consent to the offer, *id.* § 17602(a)(1); (2) charging consumer accounts

without obtaining customers' affirmative consent in an agreement containing the renewal and cancellation terms that MoneyLion applies to its Plus members, *id.* § 17602(a)(2); (3) failing to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, *id.* § 17602(a)(3); and/or (4) failing to permit consumers who accept its automatic renewal or continuous service offers online to terminate the automatic renewal or continuous service exclusively online, *id.* § 17602(c); and/or

(e) Denying borrowers their right to redeem their collateral by refusing to accept borrowers' tender of their Investment Accounts to satisfy their loan debt, in violation of Cal. Com. Code § 9623.

135. Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC, has engaged in *unfair* business practices that include, but are not limited to, the following:

(a) Maintaining a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships until their entire Loan balance is paid;

(b) Maintaining a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships until all past and present MoneyLion Plus Membership Fees are paid;

(c) Failing to disclose that MoneyLion maintains a policy or practice of prohibiting borrowers from cancelling their MoneyLion Plus memberships until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid;

(d) Demanding that borrowers pay Membership Fees for months during which they received no membership benefits because their membership benefits were "paused" by MoneyLion;

(e) Refusing to resume Plus membership benefits in months that borrowers did pay Membership Fees based on the existence of missed payments for past months (months during which the borrowers received no membership benefits anyway because MoneyLion paused them);

(f) Requiring borrowers seeking to cancel their MoneyLion Plus membership to endure inordinate wait times for customer service calls, and otherwise using unresponsive, incomprehensible, and technically deficient customer support systems to create barriers to borrowers cancelling their MoneyLion Plus memberships;

(g) Collecting past-due Membership Fees supposedly owed to MoneyLion by offsetting such sums against funds borrowers have saved in their Investment Accounts;

(h) Generally operating a scheme calculated at every turn to maximize the period by which MoneyLion can justify syphoning Membership Fees from borrowers' bank accounts; and/or

(i) Engaging in other conduct substantially injurious to consumers, offensive to public policy, immoral, unethical, oppressive, unscrupulous, and for which the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

136. Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC, has engaged in *unfair, deceptive, untrue or misleading advertising*, which includes, but is not limited to, the following:

(a) Falsely advertising that the Loan contains "no hidden fees";

(b) Falsely advertising that the Loan carries an APR of just 5.99% and costs borrowers no more than $16.66 in expected interest charges; and/or

(c) Falsely advertising that the cost of borrowing via the Loan is lower than the cost of borrowing using a typical credit card or comparable financial product.

137.   Defendants MoneyLion of California, MoneyLion, Inc., ML Plus, and ML Wealth, could and should have furthered their legitimate business interests by not perpetrating an unlawful scheme on the entire representative class of California borrowers.

138.   Plaintiff has suffered injury in fact and has lost money and/or property as a result of the unfair competition described herein.

139.   Accordingly, Plaintiff is entitled to restitution and private injunctive relief for MoneyLion's violations of California's Unfair Competition Law.

## COUNT II
### Public Injunctive Relief for Violations of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

140.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

141.   Plaintiff and Defendants are each "person(s)" within the meaning of California's Unfair Competition Law (Cal. Bus. & Prof. C. §§ 17200 *et seq.*).

142.   Plaintiff is "a person who has suffered injury in fact and has lost money or property as a result of . . . unfair competition" under Cal. Bus. & Prof. C. § 17204.

143.   Under California's Unfair Competition Law, a private plaintiff who has suffered a financial injury may sue in a private attorney general and/or representative capacity to obtain relief for others.

144.   In addition to the relief sought on behalf of themselves and the Class Members, as set forth in in Counts I, III, V, and VI, Plaintiff separately brings this Count II seeking injunctive relief primarily benefitting the general public and benefitting her only incidentally as a member of the general public.

145.   Defendant MoneyLion of California, acting in concert and with the material assistance of Defendants MoneyLion, Inc., ML Plus, LLC, and ML Wealth, LLC, has engaged in *unlawful* and *unfair* business practices, and *unfair, deceptive,*

*untrue or misleading advertising* as set forth in Paragraphs 134-136 and their subparts, which are incorporated in this Count II by reference.

146.   Plaintiff requests that the Court, to protect and enforce important public rights, enter a permanent injunction prohibiting MoneyLion, its agents, servants, employees, and all persons acting in concert with it, from engaging in the following:

(a) Falsely advertising to the general public within the State of California that the Loan contains "no hidden fees";

(b) Falsely advertising to the general public within the State of California that the Loan carries an APR of just 5.99% and costs borrowers no more than $16.66 in expected interest charges;

(c) Falsely advertising to the general public within the State of California that the cost of borrowing via the Loan is lower than the cost of borrowing using a typical credit card or comparable financial product;

(d) Lending money to future borrowers within the State of California in connection with a consumer loan, and contracting or receiving "charges," as the term is defined by Cal. Fin. Code § 22201, at rates exceeding the amounts authorized under Cal. Fin. Code § 22201;

(e) Requiring, in connection with or incidental to the making of consumer loans to future members or borrowers within the State of California, that borrowers within the State of California contract for purchase, or agree to purchase, a MoneyLion Plus membership, in violation of the collateral sale prohibition set forth in Cal. Fin. Code § 22311 and § 22312;

(f) Employing against the general public and public officials within the State of California a devise, subterfuge, or pretense to charge, contract, and/or receive greater interest, consideration, or charges from residents of the State of California than the amounts or types authorized by the California Finance Code, principally by disguising interest charges as "membership fees" and making them payable to Defendant ML Plus, a non-licensed lender, to avoid

detection of usurious lending practices by the general public and public regulators and enforcement officials;

(g) Offering its Plus subscription, through advertising and communications directed at the general public, on an automatic renewal or continuous service basis to consumers in California without complying with the laws enacted to protect the general public in the context of automatic renewal transactions;

(h) Maintaining a policy or practice of prohibiting present, prospective, and future members/borrowers within the State of California from cancelling their MoneyLion Plus memberships until their entire Loan balance is paid;

(i) Maintaining a policy or practice of prohibiting present, prospective, and future members/borrowers from cancelling their MoneyLion Plus memberships until all past and present Membership Fees are paid;

(j) Failing to disclose to the general public that MoneyLion maintains a policy or practice of prohibiting present, prospective, and future members/borrowers from cancelling their MoneyLion Plus memberships until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid;

(k) Demanding that present, prospective, and future members/borrowers pay Membership Fees for months during which they received no membership benefits because their membership benefits were "paused" by MoneyLion;

(l) Refusing to resume Membership benefits in months that present, prospective, and future members/borrowers *did pay* membership fees based on the existence of missed membership payments for past months (months during which the borrowers received no membership benefits anyway because MoneyLion paused them); and/or

(m) Requiring prospective and future members/borrowers seeking to cancel their MoneyLion Plus membership to endure inordinate wait times for customer service calls, and otherwise using unresponsive, incomprehensible, and

technically deficient customer support systems to create barriers to prospective and future members/borrowers cancelling their MoneyLion Plus memberships;

147. Plaintiff further requests that the Court, to protect and enforce important public rights, enter a permanent injunction *affirmatively* compelling MoneyLion, its agents, servants, employees, and all person acting in concert with it, to do the following:

(a) Disseminate corrective advertising to the general public within the State of California sufficient to inform the general public that the cost of borrowing under the Loan exceeds 5.99% APR;

(b) Disseminate corrective advertising to the general public within the State of California sufficient to inform the general public that the Loan does not, in fact, contain "no hidden fees";

(c) Disseminate corrective advertising to the general public within the State of California that the cost of borrowing via the Loan is, in fact, higher than the cost of borrowing using a typical credit card or comparable financial product;

(d) Disseminate corrective advertising to the general public within the State of California sufficient to disclose that MoneyLion maintains a policy or practice of prohibiting present, prospective, and future members/borrowers from cancelling their MoneyLion Plus memberships until their entire Loan and all past and all present MoneyLion Plus Membership Fees are paid;

(e) Disseminate corrective advertising to the general public within the State of California sufficient to disclose that the Plus Fees are not "Membership Fees," as a reasonable consumer would understand the phrase, for the reasons described in Paragraphs 70-78; and/or

(f) Disseminate corrective advertising to the general public within the State of California sufficient to inform the general public of the falsity of other

misrepresentations identified herein, and which may be later identified through the course of this litigation.

148.    In addition to the public injunctive remedies set forth above, Plaintiff also seeks an award of attorneys' fees pursuant to the private attorney general doctrine, codified at Cal. Civ. Proc. Code § 1021.5, for enforcing "an important right affecting the public interest", and because successful prosecution of this Count will confer "a significant benefit . . . on the general public" and such an award is appropriate in light of the "the necessity and financial burden of private enforcement."

## COUNT III
### Damages and Private Injunctive Relief for Violations of California's Consumer Legal Remedies Act
### (Cal. Civ. Code §§ 1750 *et seq.*)

149.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

150.   California's Consumers Legal Remedies Act ("CLRA") sets forth a list of prohibited "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."

151.   The Legislature's intent in promulgating the CLRA is reflected in Section 1760, which mandates that its terms are to be "[c]onstrued liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

152.   MoneyLion's Loans and MoneyLion Plus membership program constitute "services" under Cal. Civ. Code § 1761(a).

153.   Plaintiff and the Class Members are each a "consumer" under Cal. Civ. Code § 1761(d).

154.   Plaintiff's and the Class Members' Loans and Membership Fees constitute "transactions" under Cal. Civ. Code § 1761(e).

155.   MoneyLion's scheme violates Subsections (a)(5), (a)(9), (a)(14), (a)(16), (a)(19), (a)(26) of Cal. Civ. Code § 1770, including by:

(a) representing that the Loan and/or membership have characteristics that they do not have;

(b) advertising the Loan as 5.99% APR with the intent to charge borrowers more than 5.99% APR;

(c) representing that MoneyLion is entitled to require membership as a condition to taking out or maintaining a Loan, when such conduct is prohibited by law;

(d) representing that the Loan and/or membership have been supplied in accordance with its previous representations when they have not;

(e) inserting unconscionable clauses in contracts; and/or

(f) advertising, offering for sale, or selling a financial product that is illegal under California and federal law.

156.   Plaintiff and the Class members have suffered harm by the conduct described in this Complaint and will continue to suffer harm unless such conduct is enjoined by this Court.

157.   On July 30, 2019, Plaintiff sent separate demand letters pursuant to California Civil Code § 1782 via certified mail, return receipt requested, to each of Defendants, MoneyLion of California, MoneyLion, Inc., ML Plus, and ML Wealth, requesting corrective action on behalf of herself and the Class Members.

158.   Each letter was received by an agent of each respective MoneyLion entity in California on August 2, 2019.

159.   More than thirty days have passed since MoneyLion's receipt of the CLRA demand letters and, as of the date of this filing, MoneyLion has failed to offer or undertake an appropriate correction, repair, replacement, or other remedy, or otherwise even respond to Plaintiff's letters.

160.   Pursuant to California Civil Code § 1782(a), Plaintiff and the Class Members may therefore maintain and action for damages under the CLRA.

161.   Attached at the conclusion of this Complaint is a signed declaration from Plaintiff attesting that this action has been commenced in a county where MoneyLion is doing business and/or where the transactions giving rise to this suit or any substantial portion thereof occurred, pursuant to Cal. Civ. Code § 1780(d).

162.   Accordingly, Plaintiff and the Class Members are entitled to an award of actual damages; an order enjoining the methods, acts, or practices described herein; restitution; punitive damages; and/or any other relief that the court deems proper.

### COUNT IV
**Public Injunctive Relief for Violations of California's
Consumer Legal Remedies Act
(Cal. Civ. Code §§ 1750 *et seq.*)**

163.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

164.   Plaintiff brings this Count on behalf of the general public in the State of California and/or for the primary benefit of the general public, and her benefit only incidentally as a member of the general public, to enjoin conduct injurious to the general public.

165.   The CLRA sets forth a list of prohibited "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."

166.   The Legislature's intent in promulgating the CLRA is reflected in Section 1760, which mandates that its terms are to be "[c]onstrued liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

167.   MoneyLion's Loans and MoneyLion Plus membership program constitute "services" under Cal. Civ. Code § 1761(a).

168.   Plaintiff is a "consumer" under Cal. Civ. Code § 1761(d), and has suffered damage as a result of the use or employment by MoneyLion of the methods,

acts, or practices set forth in Paragraph 155, which are unlawful under Cal. Civ. Code § 1761(d).

169.   Plaintiff, on behalf of the general public, requests that the Court—to protect and enforce important public rights and restrain conduct injurious to the general public—enter a permanent injunction prohibiting MoneyLion, its agents, servants, employees, and all person acting in concert with it, from engaging in the following conduct:

(a) representing to the general public that the Loan and/or membership have characteristics that they do not have;

(b) advertising to the general public the Loan as 5.99% APR with the intent to charge borrowers more than 5.99% APR;

(c) representing to the general public that MoneyLion is entitled to require Plus membership as a condition to taking out or maintaining a Loan, when such conduct is prohibited by law;

(d) representing to the general public that the Loan and/or Plus membership will be supplied in accordance with previous representations when they will not be;

(e) offering to enter lending, services, and other contractual relationships with the general public governed by unconscionable clauses in contracts; and/or

(f) advertising, offering for sale, or selling to the general public a financial product that is unlawful under California and federal law.

170.   Plaintiff further requests that the Court, to protect and enforce important public rights and prevent conduct injurious to the general public, enter a permanent injunction *affirmatively* compelling MoneyLion, its agents, servants, employees, and all person acting in concert with it, to do the following:

(a) Disseminate corrective advertising and/or other notice to the general public sufficient to accurately inform the general public about the true costs, terms,

and characteristics of the Loan and/or membership obligations that MoneyLion imposes on consumers;

(b) Disseminate corrective advertising and/or other notice to the general public sufficient to accurately inform the general public that MoneyLion cannot lawfully insist on a collateral purchase of a Plus membership as a condition to the extension of credit; and/or

(c) Disseminate corrective advertising and/or other notice to the general public sufficient to accurately inform the general public that MoneyLion's services are not offered in accordance with its previous representations or in a manner consistent with the commercial expectations of reasonable consumers, including its strange treatment of "Membership Fees."

171.    In addition to the public injunctive remedies set forth above, Plaintiff also seeks an award of attorneys' fees pursuant to the private attorney general doctrine, codified at Cal. Civ. Proc. Code § 1021.5, for enforcing important rights "affecting the public interest"; because successful prosecution of this Count will confer "a significant benefit . . . on the general public"; and because such and award is appropriate in light of the "the necessity and financial burden of private enforcement."

## **COUNT V**
### **Violations of California's Anti-Usury Laws**
### **(Cal. Const. art. XV, § 1 and Cal. Civ. Code § 1916-2)**

172.    Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

173.   Defendants MoneyLion, Inc. and MoneyLion Plus—unlike Defendant MoneyLion of California—are not licensed by the California Division of Finance.

174.   Defendants MoneyLion, Inc. and MoneyLion Plus therefore do not qualify for any exemption from California's constitutional usury provision or from Cal. Civ. Code § 1916-2.

175.   Cal. Const. art. XV, § 1 prohibits Defendants MoneyLion, Inc. and MoneyLion Plus from "charging any fee, bonus, commission, discount or other compensation receive[d] from a borrower more than the interest authorized by this section upon any loan," or 10 percent per annum.

176.   Alternatively, Cal. Civ. Code § 1916-2 prohibits Defendants MoneyLion, Inc. and MoneyLion Plus "directly or indirectly tak[ing] or receiv[ing] . . . any greater sum or any greater value for the loan . . . than at the rate of twelve dollars upon one hundred dollars for one year," or 12%.

177.   Nevertheless, Defendants MoneyLion, Inc. and MoneyLion Plus have charged and continue to charge fees and interest (the disclosed interests plus the supposed Membership Fees) to borrowers at rates exceeding 300%.

178.   The fees and interest that Defendants MoneyLion, Inc. and MoneyLion Plus charge to borrowers are plainly usurious under Cal. Const. art. XV, § 1 and Cal. Civ. Code § 1916-2.

179.   Plaintiff and the Class Members have suffered harm as a result of Defendants MoneyLion, Inc. and MoneyLion Plus charging and/or receiving interest and fees at usurious rates, including financial loss and reputational harm.

180.   Pursuant to Cal. Civ. Code § 1916-3(a), Plaintiff and the Class Members are entitled to recover three-times the losses they have sustained as a result of Defendants MoneyLion, Inc. and MoneyLion Plus charging and/or receiving interest and fees at usurious rates.

## COUNT VI
### Violations of Truth in Lending Act and Regulation Z
### (15 U.S.C. §§ 1601 *et seq.*)

181.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

182.   The Loans marketed, originated, and serviced by MoneyLion are closed-end consumer installment loans.

183. The Truth in Lending Disclosure statement prepared by Defendant MoneyLion of California disclosed an amount financed of $500, a finance charge of $16.66, an annual percentage rate of 5.99%, and a security interest in Plaintiff and the Class Members' Investment Accounts and Automatic Payment Authorizations.

184. "Finance charge," as defined in the Regulation Z § 226.4(a)(1), includes "fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor . . . [r]equires the use of a third party as a condition of or an incident to the extension of credit."

185. The supposed Membership Fees charged by Defendant MoneyLion Plus are, in fact, disguised finance charges:

(a) the Membership Fees are payable by Plaintiff and the Class Members as a condition of, and incident to, the extension of credit;

(b) Plaintiff's and the Class Members' obligation to pay them depends only on whether they have an outstanding Loan—not on whether actually receive any Plus Member Benefits;

(c) MoneyLion charges and collects Membership Fees to compensate and insure itself against borrowers' risk of defaulting on a Loan;

186. The Truth in Lending Disclosure statement issued in conjunction with this consumer credit transaction therefore violated requirements of Truth in Lending and Regulation Z by failing to include in the finance charge certain charges imposed by MoneyLion and payable by Plaintiff and the Class Members incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 226.4, including by:

(a) Inaccurately disclosing a finance charge of approximately $16.66 for the Loan, when the true finance charge exceeded $364.66, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z § 226.18(d);

(b) Inaccurately expressing the finance charge as an "annual percentage rate" of 5.99%, when the true annual percentage rate exceeded 300%, in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(e);

187.   As a result of the foregoing violations of the Truth in Lending Act and Regulation Z, Plaintiff and the Class Members are entitled to recover actual and statutory damages, attorneys' fees, and costs.

## COUNT VII
### Public Injunctive Relief for Violations of California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500 *et seq.*)

188.   Plaintiff incorporates all prior Paragraphs of this Complaint as if set forth fully herein.

189.   Plaintiff brings this Count on behalf of the general public in the State of California and/or for the primary benefit of the general public, and her benefit only incidentally as a member of the general public, to enjoin conduct injurious to the general public.

190.   MoneyLion has made, disseminated, and caused to be made or disseminated—in advertisements and other communications to the public in the State of California— statements concerning its products and services, including its Plus subscription and Loan, statements about such products or services which are untrue or misleading, including but not limited to statements that:

(a) That the Loan contains "no hidden fees";

(b) That Loan carries an APR of just 5.99% and costs borrowers no more than $16.66 in expected interest charges;

(c) That the cost of borrowing via the Loan is lower than the cost of borrowing using a typical credit card or comparable financial product;

(d) That the monthly Plus fees are "Membership Fees," as consumers would reasonably understand the term, paid in consideration for valuable Plus "perks" and not finance charges and/or charges incident to the extension of credit;

(e) That Plus Members can expect to enjoy a "private banking" like experience with their membership;

(f) That MoneyLion takes consumer feedback "very seriously," and that it aims to "respond promptly" to customer concerns;

(g) That MoneyLion provides "*the Financial Membership that Gives and Doesn't Take*";

(h) That one can "*Invest as Little or as Much As You Want with MoneyLion*";

(i) That, with MoneyLion, you will "*Never Pay A Bank Fee Again. Ever*"; and/or

(j) Other misrepresentations identified in this Complaint;

191.   MoneyLion disseminates these and other statements to the general public in the State of California through various media, including internet and social media advertising, sweepstakes promotions, targeted emails, referral incentives, sponsorship of a NASCAR racing team, and others means.

192.   MoneyLion knows, or by the exercise of reasonable care should know, that the above statements and advertising are untrue or misleading,

193.   Plaintiff relied on MoneyLion's statements concerning its products and services, including its Plus subscription and Loan, which she viewed online and in email communications, and suffered financial injury as a result of such reliance.

194.   Plaintiff requests that the Court, to protect and enforce important public rights, enter a permanent injunction prohibiting MoneyLion, its agents, servants, employees, and all person acting in concert with it, from engaging in the false advertising described herein.

195.   Plaintiff further requests that the Court, to protect and enforce important public rights, enter a permanent injunction *affirmatively* compelling MoneyLion, its agents, servants, employees, and all person acting in concert with it, to disseminate corrective advertising/notice to the general public within the State of California sufficient to

(a) inform the general public that the advertising described herein is false; and

(b) inform the general public about the true nature, costs, and terms upon which MoneyLion offers and provides its products and services.

196. In addition to the public injunctive remedies set forth above, Plaintiff also seeks an award of attorneys' fees pursuant to the private attorney general doctrine, codified at Cal. Civ. Proc. Code § 1021.5, for enforcing "an important right affecting the public interest"; because successful prosecution of this Count will confer "a significant benefit . . . on the general public"; and because such and award is appropriate in light of the "the necessity and financial burden of private enforcement."

## JURY DEMAND

197. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

(a) For public injunctive relief, on behalf of and/or for the benefit of the general public, to protect and enforce important public rights and restrain conduct injurious to the public;

(b) For an award of attorneys' fees pursuant to the private attorney general doctrine, codified at Cal. Civ. Proc. Code § 1021.5, for enforcing an important right affecting the public interest;

(c) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class Members;

(d) For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

(e) For an order finding in favor of Plaintiff and the Class Members on all counts asserted herein;

(f) For compensatory (including but not limited to emotional distress), statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(g) For prejudgment interest on all amounts awarded;

(h) For an order of restitution and all other forms of equitable monetary relief;

(i) For injunctive relief, including public injunctive relief, as pleaded or as the Court may deem proper; and

(j) For an order awarding Plaintiff and the Class Members their reasonable attorneys' fees and expenses and costs of suit.

Dated: October 15, 2019.                    Respectfully Submitted,

                                            /s/ Kolin C. Tang
                                            Kolin C. Tang (SBN 279834)
                                            **SHEPHERD, FINKELMAN, MILLER
                                            & SHAH, LLP**
                                            1401 Dove Street
                                            Suite 540
                                            Newport Beach, CA 92660
                                            Phone: 323-510-4060
                                            Fax: 866-300-7367
                                            Email: ktang@sfmslaw.com

                                            James C. Shah (SBN 260435)
                                            **SHEPHERD FINKELMAN
                                            MILLER & SHAH, LLP**
                                            35 E. State St. Media, PA 19063
                                            Telephone: 610-891-9880
                                            Facsimile: 866-300-7367
                                            Email: jshah@sfmslaw.com

                                            John F. Edgar (PHV forthcoming)
                                            Michael R. Owens (PHV forthcoming)

**EDGAR LAW FIRM LLC**
2600 Grand Blvd., Ste. 440
Kansas City, MO 64108
Telephone:   (816) 531-0033
Facsimile:   (816) 531-3322
Email: jfe@edgarlawfirm.com
Email: mro@edgarlawfirm.com

*Attorneys for Plaintiff, individually, for the general public, and on behalf of all others similarly situated*

## DECLARATION OF MARGGIEH DICARLO
## PURSUANT TO CAL. CIV. CODE § 1780(d)

I, Marggieh DiCarlo, do hereby declare and swear upon penalty of perjury of that the following is true and correct:

1.     I am over the age of 18, of sound mind, and otherwise competent to testify to the facts stated herein.

2.     On July 19, 2018, from within in the County of San Bernardino, California, I enrolled in MoneyLion Plus through the MoneyLion mobile application on my smartphone.

3.     On July 26, 2018, one week after enrolling in MoneyLion Plus, I applied for and received MoneyLion's $500 5.99% APR Credit Builder Loan—also through the MoneyLion mobile application on my smartphone while I was within the County of San Bernardino, California.

4.     When applying for a MoneyLion loan and enrolling in its MoneyLion Plus program, I was asked to provide my home address.  I provided MoneyLion my correct home address, which is situated within the County of San Bernardino, California

5.     I have resided in the County of San Bernardino, California for more than 15 years, and continue to reside here as of the date of this declaration.

6.     It is my understanding and belief that MoneyLion offers its loans and MoneyLion Plus to consumers throughout the State of California, including in San Bernardino County.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October _8_, 2019.          By: _Marggieh DiCarlo_

Marggieh DiCarlo