**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARGGIEH DICARLO, Individually and on Behalf of All Others Similarly Situated, <br> *Plaintiff-Appellant*, <br><br> v. <br><br> MONEYLION, INC.; MONEYLION OF CALIFORNIA, LLC; ML PLUS, LLC; ML WEALTH, LLC, <br> *Defendants-Appellees*. | No. 20-55058 <br><br> D.C. No. 5:19-cv-01374-PSG-SHK <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, Chief District Judge, Presiding

Argued and Submitted December 11, 2020
Pasadena, California

Filed February 19, 2021

Before: Carlos T. Bea, Amul R. Thapar,[*] and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Thapar

---

[*] The Honorable Amul R. Thapar, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order compelling arbitration pursuant to the Federal Arbitration Act and dismissing a putative class action against MoneyLion, Inc., et al., operator of a smartphone app offering financial services to its customers.

Marggieh DiCarlo enrolled in the MoneyLion Plus program and signed a Membership Agreement, which explained that Plus members owed monthly fees, monthly investment deposits, and (if applicable) monthly loan payments. DiCarlo alleged that MoneyLion violated California's Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act in refusing to allow her to cancel her Plus membership when she fell behind on her fees, deposits, and loan payments. MoneyLion moved to compel arbitration under a provision of the Membership Agreement.

The panel affirmed the district court's conclusion that the Agreement's arbitration provision was valid and enforceable because it allowed public injunctive relief in arbitration and therefore did not violate California's *McGill* rule. The Agreement authorized the arbitrator to award all injunctive remedies available in an individual lawsuit under California law. DiCarlo argued that she could secure public injunctive relief only by acting as a private attorney general, which the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Agreement explicitly prohibited. The panel, however, held that public injunctive relief under California's UCL, FAL, and CLRA is available in an individual lawsuit without a plaintiff acting as a private attorney general.

**COUNSEL**

Michael R. Owens (argued) and Bradley T. Wilders, Stueve Sigel Hanson LLP, Kansas City, Missouri; John F. Edgar, Edgar Law Firm LLC, Kansas City, Missouri; for Plaintiff-Appellant.

Fred R. Puglisi (argued) and Jay T. Ramsey, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

THAPAR, Circuit Judge:

Marggieh DiCarlo says that MoneyLion lured her into debt to the tune of several hundred dollars. The district court dismissed her complaint and compelled arbitration instead. We affirm.

**I.**

MoneyLion operates a smartphone app that offers financial services to its customers.[1] One service is the

---

[1] Defendants are MoneyLion, Inc.; MoneyLion of California, LLC; ML Plus, LLC; and ML Wealth, LLC. We refer to them collectively as "MoneyLion."

MoneyLion Plus program. The program offers a $500 credit-builder loan. With a 5.99% annual percentage rate, individuals with little or poor credit history can start to create a positive record.

Marggieh DiCarlo wanted to open her own hair salon, but she needed credit. So she enrolled in the Plus program and took out a credit-builder loan.

Like everyone who joins the Plus program, DiCarlo signed a Membership Agreement. The Agreement explains that Plus members owe monthly fees, monthly investment deposits, and (if applicable) monthly loan payments. It also has a provision that gives each party the right to demand arbitration in case of a dispute.

After a few months, DiCarlo fell behind on her fees, deposits, and loan payments. She tried to cancel her Plus membership, but MoneyLion refused. First, she had to pay off the loan in full. And that could happen only after she covered the still-accumulating membership fees. DiCarlo couldn't afford the fees, so she was stuck.

DiCarlo filed this putative class action to take down MoneyLion's "high-tech debt trap." She alleged that MoneyLion had violated, among other things, California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA"). *See* Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL); *id.* § 17500 *et seq.* (FAL); Cal. Civ. Code § 1750 *et seq.* (CLRA). MoneyLion moved to compel arbitration, and the district court granted the motion and dismissed the action. *See* 9 U.S.C. § 4. This appeal followed.

## II.

### A.

The focus of this case is the validity (or invalidity) of the Agreement's arbitration provision. If the provision is valid, then the Federal Arbitration Act ("FAA") requires the district court to enforce it strictly. 9 U.S.C. § 2. But DiCarlo insists that the provision violates California law by prohibiting public injunctive relief. If she's right, then the arbitration provision will self-destruct; a poison-pill clause will render the "entire [a]rbitration [p]rovision . . . null and void." ER 203 (emphasis omitted). There will be no arbitration obligation for the court to enforce.

The district court rejected DiCarlo's interpretation of the arbitration provision. It determined that the provision allowed public injunctive relief and so did not violate California law.

We review the district court's interpretation of the Agreement (and resulting decision to compel arbitration) de novo. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017). The focus is the parties' "objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties." *Reilly v. Inquest Tech., Inc.*, 160 Cal. Rptr. 3d 236, 249 (Ct. App. 2013) (cleaned up). When in doubt, both federal and state law point toward interpreting the Agreement to permit arbitration. Cal. Civ. Code § 1643 (instructing courts to adopt a "lawful" contract interpretation that is "capable of being carried into effect" when possible); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (favoring arbitration).

**B.**

California's legal requirement that contracts allow public injunctive relief is known as the *McGill* rule. *See McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017). Public injunctive relief is "relief that by and large benefits the general public . . . and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public." *Id.* at 89 (cleaned up).

Consider the relief sought here. Among other things, DiCarlo seeks to enjoin MoneyLion from "[f]alsely advertising to the general public within the State of California that the [credit-builder] Loan contains 'no hidden fees.'" ER 149. But what good will that do her in the future? She already knows that these claims are (allegedly) untrue. That's why she sued. DiCarlo seeks the injunction to aid those who do not already know what she has learned. *McGill*, 393 P.3d at 89–90. That is public injunctive relief.

In *McGill*, the California Supreme Court held that no one can contractually waive all rights to seek public injunctive relief. *Id.* at 94; *see Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 830–31 (9th Cir. 2019) (holding that the FAA does not preempt the *McGill* rule). The UCL, FAL, and CLRA all authorize public injunctive relief. Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(2); *Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1162, 1164 (Cal. 2003). Thus, any contract that bars public injunctive relief in both court and arbitration is invalid. *McGill*, 393 P.3d at 94; *see Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 934–35 (9th Cir. 2013). By permitting either party to compel arbitration unilaterally, the Agreement effectively cuts off the availability of public injunctive relief in court. So the relief must remain possible in arbitration proceedings, or

DICARLO V. MONEYLION 7

else the arbitration provision violates California law and triggers the poison-pill clause.

MoneyLion insists that DiCarlo can get public injunctive relief in arbitration. The Agreement, after all, "authorize[s]" the arbitrator to "award all [injunctive] remedies available in an individual lawsuit under [California] law." ER 202–03. And, says MoneyLion, public injunctive relief is available in an individual lawsuit. DiCarlo disagrees. She says that she can secure public injunctive relief only by acting as a private attorney general, which the Agreement explicitly prohibits. ER 202. Whoever is right wins.

Thus, the question presented: Is public injunctive relief under the relevant statutes available in an "individual lawsuit" without a plaintiff "act[ing] as a private attorney general"? ER 202–03 (capitals omitted).

## III.

To answer that question, we need to determine (A) the scope of an individual lawsuit, and (B) when someone acts as a private attorney general.

## A.

What does the Agreement mean by "an individual lawsuit"? To refresh, if public injunctive relief is available in an individual lawsuit under California law, then the arbitrator is "authorized" to grant it under the all-remedies clause. We understand the term (as used in the Agreement) to encapsulate any lawsuit brought by a single plaintiff who represents only herself—no class actions, no mass actions, no derivative actions, etc. This understanding aligns with the Agreement's prohibition of class actions as well as claim joinder. Under the joinder clause, DiCarlo is not allowed to

8 DiCarlo v. MoneyLion

"join or consolidate claim(s) involving you with claims involving any other person." ER 202 (capitals omitted). Each MoneyLion member must arbitrate separately.

DiCarlo argues that the joinder clause does not simply mean members must arbitrate separately. She contends that it restricts an individual lawsuit to one that has no substantial impact on others, including in the relief sought. This would mean that a claim for public injunctive relief, which undoubtedly impacts others, would violate the joinder clause and therefore fall outside an individual lawsuit. DiCarlo is incorrect.

The joinder clause does not prohibit all claims that impact other people. It draws a line between two distinct types of claims—those "involving you" and those "involving any other person"—and prohibits bringing one of each type in the same proceeding. To speak sensibly of joining, consolidating, or separating these types of claims, we must read the categories as exclusive. Claims *either* "involv[e] you" *or* "involv[e] any other person." This does not take away from the meaning of an individual lawsuit.

A simple example proves the point. Imagine John is bombarded with robocalls. He sues the company responsible for making his contact information public. His claim "involv[es him]." Then his neighbor, Maria, hears about the lawsuit and wants to get in on the action. She says that she too has been weighed down by the constant calls. If John brings a second claim in his lawsuit that relies on robocalls to Maria, this claim will "involv[e] any other person" (Maria) and will not be his own claim.

The joinder clause here says that John and Maria are both free to attack the company's practice, but they must do so separately. John may not assert claims on behalf of both of

them or proceed with Maria as a co-plaintiff (joinder). Nor can they seek to try the two lawsuits together (consolidation).

None of this hinges on the relief sought. If Maria never sued, John's victory against the company could theoretically result in an injunction that broadly affects others, or a damages action so large as to run the company out of business. Both results would have enormous impact on others, including Maria. But it is still John's claim only.

## B.

What about a "private attorney general"? Recall that, under the Agreement, DiCarlo may not take on that role in arbitration. The definition of a private attorney general is hard to pin down. *See, e.g.*, William B. Rubenstein, *On What a "Private Attorney General" Is—And Why It Matters*, 57 Vand. L. Rev. 2129, 2130, 2171 (2004); Trevor W. Morrison, *Private Attorneys General and the First Amendment*, 103 Mich. L. Rev. 589, 590 (2005). We have identified two distinct but closely related concepts: the standing-to-sue private attorney general and the fee-shifting private attorney general.

### 1.

*Standing to Sue.* At its core, the standing-to-sue private attorney general is not employed by the state but still litigates the rights and interests of the public.

Traditionally, individuals could challenge a government action only when that action harmed their own legal rights—for example, through prosecution, tortious acts, or a breach of contract. *See* Gary Lawson, *Federal Administrative Law* 1079–80 (8th ed. 2019); Caleb Nelson, *"Standing" and*

*Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 712–15 (2019); *see also Flast v. Cohen*, 392 U.S. 83, 117–20 (1968) (Harlan, J., dissenting). But that changed in the mid-twentieth century, when Congress and the Supreme Court transformed the relationship between rights and remedies in challenging government action. *See* Nelson, *supra*, at 712–25; *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("Where statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action.").

Various statutory schemes provided a cause of action for "aggrieved" individuals who had suffered a factual—but not a legal—injury from allegedly unlawful government action. Lawson, *supra*, at 1081; Nelson, *supra*, at 721. The Supreme Court endorsed this regime, which granted standing to "private litigants . . . only as representatives of the public interest." *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 14 (1942); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 476–77 (1940); Elizabeth Magill, *Standing for the Public: A Lost History*, 95 Va. L. Rev. 1131, 1139–48 (2009). This was the "private Attorney General[]." *Associated Indus. of N.Y. State v. Ickes*, 134 F.2d 694, 704 (2d Cir. 1943) (coining the term), *vacated as moot*, 320 U.S. 707, 707 (1943) (per curiam).

California went a step further with some statutes. In those instances, the private attorney general did not need to suffer even a factual injury. *See Californians for Disability Rts. v. Mervyn's, LLC*, 138 P.3d 207, 209 (Cal. 2006). More on this regime in a bit.

To sum up, the standing-to-sue private attorney general is at its core a non-government actor who represents the public's rights or interests in court.

DICARLO V. MONEYLION 11

## 2.

*Fee Shifting.* Then there is the fee-shifting private attorney general. Courts generally have an "equitable power, in the absence of legislation, to award attorneys' fees" to a prevailing litigant "in the interest of justice." *Brandenburger v. Thompson*, 494 F.2d 885, 888–89 (9th Cir. 1974). This equitable practice died long ago in the federal courts but continues in many state courts. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 269 (1975) (federal courts); *In re Water Use Permit Applications*, 25 P.3d 802, 804–06 (Haw. 2001) (surveying state-court approaches nationwide).

At both the federal and state level, legislatures have mimicked the equitable practice by statute. Legislatures often lean heavily on private enforcement of civil-rights legislation. To incentivize that enforcement, some civil-rights statutes make attorney's fees available to the prevailing plaintiff. Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 Nw. U. L. Rev. 1459, 1461–62 (2007). The fee-shifting provisions act as "a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory." *Farrar v. Hobby*, 506 U.S. 103, 122 (1992) (O'Connor, J., concurring); *see also Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (per curiam). The prevailing plaintiff is the fee-shifting private attorney general.

## C.

With that background, we can return to the question at hand: Must DiCarlo act as a private attorney general to seek public injunctive relief? The evolution of the UCL and FAL,

| 12 | DICARLO V. MONEYLION |
|---|---|

along with the California Supreme Court's treatment of them, convinces us that the answer is no. Public injunctive relief is available under California law in individual lawsuits—not just in private-attorney-general suits. It follows that DiCarlo may secure that relief in arbitration under the Agreement.

Both the UCL and FAL formerly gave standing to "any person acting for the interests" of "the general public." Cal. Bus. & Prof. Code §§ 17204, 17535 (2004). That fit squarely within the concept of the standing-to-sue private attorney general. *See Nike, Inc. v. Kasky*, 539 U.S. 654, 661 (2003) (Stevens, J., concurring); *Californians for Disability Rts.*, 138 P.3d at 213 (referring to "uninjured persons" suing under the UCL as "private attorneys general").

That all changed when Californians passed Proposition 64. They decided "that only the California Attorney General and local public officials [should] prosecute actions on behalf of the general public." Prop. 64, § 1(f), 2004 Cal. Stat. A-337; *see In re Tobacco II Cases*, 207 P.3d 20, 41–42 (Cal. 2009) (Baxter, J., concurring and dissenting). After Proposition 64, individuals must suffer their own injuries to sue. Prop. 64, §§ 3, 5, 2004 Cal. Stat. A-338 to -340; *Californians for Disability Rts.*, 138 P.3d at 210. What's more, they can no longer bring a UCL or FAL claim "for the interests of . . . the general public." Prop. 64, §§ 3, 5, 2004 Cal. Stat. A-338 to -340.[2] No more private attorneys general.

This led to a question for the California Supreme Court: Without the ability to act for the interests of the public, can

---

[2] Representative actions remain available, but only through class actions. *Arias v. Superior Court*, 209 P.3d 923, 927–29 (Cal. 2009).

individual UCL and FAL litigants still seek public injunctive relief in *individual* lawsuits? *McGill*, 393 P.3d at 92. The court held that, because individuals seeking public injunctive relief under the UCL and FAL do so "on [their] *own* behalf" and not "on behalf of the general public," the relief remains available. *Id.* at 92–93 (emphasis added; cleaned up). Though the court's discussion did not address the CLRA, there is no apparent reason why a suit under the CLRA for the same relief could not just as plausibly be brought "on [the plaintiff's] own behalf."

As for the fee-shifting private attorney general, we do not think it affects the analysis for this particular Agreement. A ban on the actual shifting of fees would not be relevant. DiCarlo has not stated that she seeks attorney's fees, so a fee-shifting ban would have no effect. In any case, we have no reason to think that the availability of public injunctive relief could hinge on whether those fees are up for grabs.

Nor do we read the Agreement to bar any claims that *could* support fee shifting in court. Contract terms are interpreted in light of the company they keep. *Eisen v. Tavangarian*, 248 Cal. Rptr. 3d 744, 760 (Ct. App. 2019) (applying noscitur a sociis to adopt a "more limited reading" of a term); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012). The prohibition on acting as a private attorney general is listed as a forbidden "proceeding[]" and surrounded by other limitations on *how* legal interests may be adjudicated in arbitration. ER 202 (capitals and emphasis omitted). Unlike the standing-to-sue private attorney general, the fee-shifting private attorney general is defined not by *how* a claim is adjudicated, but by *what* interests are asserted (and their success). *See* Cal. Civ. Proc. Code § 1021.5; *Woodland Hills Residents Ass'n v. City Council of L.A.*, 593 P.2d 200,

206, 208–13 (Cal. 1979).  The concept does not fit with the surrounding provisions.

Thus, a plaintiff bringing an individual lawsuit may seek public injunctive relief.  The *McGill* court made clear that a litigant proceeding as an "individual" "on his or her own behalf" may "request[] public injunctive relief."  393 P.3d at 92; *accord Blair*, 928 F.3d at 829 (emphasizing that "arbitration of a public injunction does not interfere with the bilateral nature of a typical consumer arbitration").  It follows that, under the Agreement's all-remedies clause, DiCarlo is free to seek public injunctive relief in arbitration.

To be sure, DiCarlo's contrary arguments have some force.  Intuitively, one would think that a person seeking a remedy "that by and large benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public" is vindicating the public's rights.  *McGill*, 393 P.3d at 89 (cleaned up).  So it is not surprising that the California Supreme Court has previously described plaintiffs "in a public injunction action" as "act[ing] in the purest sense as a private attorney general." *Cruz*, 66 P.3d at 1162; *see also Broughton v. Cigna Healthplans of Cal.*, 988 P.2d 67, 74 (Cal. 1999) (similar).

Further, even after Proposition 64, the UCL and FAL authorize people "who ha[ve] suffered injury in fact" to bring the same action for "relief" that public officials are charged with bringing.  Cal. Bus. & Prof. Code §§ 17204, 17535.  Absent Proposition 64's context, this looks like a private-attorney-general action.  *But see McGill*, 393 P.3d at 93 (emphasizing the importance of "harmoniz[ing]" both the codified and uncodified "provisions of Proposition 64" (cleaned up)).  But for four reasons, DiCarlo's arguments fall short.

| DICARLO V. MONEYLION | 15 |
|---|---|

*First*, we must remember that the ultimate inquiry is what was the parties' "objective intent, as evidenced by the words of the contract." *Reilly*, 160 Cal. Rptr. 3d at 249. The Agreement must be read as a whole, "so as to give effect to every part." Cal. Civ. Code § 1641; *accord Palmer v. Truck Ins. Exch.*, 988 P.2d 568, 572–73 (Cal. 1999). Recall the thesis of DiCarlo's interpretation: Public injunctive relief is categorically unavailable. That cannot be squared with the clear text of the all-remedies clause: "The arbitrator . . . shall be authorized to award all remedies available in an individual lawsuit . . . , including, without limitation, . . . injunctive . . . relief." ER 202–03. We do not honor the contracting parties' expressed intent by creating internal contradictions in the Agreement.

*Second*, *Broughton* and *Cruz*'s private-attorney-general quotations must be taken in context. Both cases focused on whether the FAA preempted a different California rule, the so-called "*Broughton-Cruz* rule," against the arbitrability of claims for public injunctive relief.[3] At the time, the Supreme Court of the United States had twice rejected a lower federal court's reasoning that the FAA contained an exception for certain public-law litigation. *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 242 (1987); *Mitsubishi*, 473 U.S. at 635. The lower federal courts had "likened" the plaintiffs in these kinds of suits to "private attorney[s]-general who protect[ed] the public's interest." *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968). Both times the Court held that no such exception (if it existed) applied to the facts presented. *McMahon*, 482 U.S. at 242; *Mitsubishi*, 473 U.S. at 635. The *Broughton* court distinguished *Mitsubishi* and *McMahon* on their facts to hold

---

[3] We subsequently held that "the FAA preempts the *Broughton-Cruz* rule." *See Ferguson*, 733 F.3d at 937.

16 DICARLO V. MONEYLION

that a private-attorney-general exception *did* apply, and the *Cruz* court followed *Broughton*. *Broughton*, 988 P.2d at 74; *Cruz*, 66 P.3d at 1162–63. The term of art was borrowed from federal law for the limited purpose of distinguishing Supreme Court precedent.

*Third*, the *McGill* decision cannot be reconciled with a reading of *Broughton* and *Cruz* that makes anything more of the private-attorney-general language. As explained, the *McGill* court explicitly rejected the notion that seeking public injunctive relief meant that a plaintiff was acting "on behalf of the general public"—the quintessential act of the standing-to-sue private attorney general. 393 P.3d at 92 (citation omitted). This reasoning makes clear that the remedy sought does not define the interests vindicated.

*Fourth*, the appealing symmetry of DiCarlo's theory between the rights vindicated and the relief sought is not enough to change the result. To say the least, *McGill*'s reasoning—an individual requesting relief for the entire public is suing *only* on her own behalf—is peculiar. Unlike "private injunctive relief," this remedy is not tailored to "rectif[y] individual wrongs." *McGill*, 393 P.3d at 89 (citation omitted); *see Broughton*, 988 P.2d at 76 & n.5. But that is the law in California, and it binds this court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

## IV.

In California, litigants proceeding in individual lawsuits may request public injunctive relief without becoming private attorneys general. That means that public injunctive relief is available to DiCarlo in arbitration with MoneyLion. Since the arbitration provision does not violate the *McGill* rule, it is valid.

If any doubt remains, consider this. Only an interpretation that public injunctive relief remains available will render the arbitration provision "lawful" and "capable of being carried into effect." Cal. Civ. Code § 1643. And only this interpretation facilitates arbitration. *Mitsubishi*, 473 U.S. at 626. So both California law and the FAA tell us what to do next—construe the Agreement to abide by *McGill* and allow arbitration.

We **AFFIRM**.